UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAWN M. GREELEY,

Plaintiff,

v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

Defendant.

04 10772

MAGISTRATE JUDGE

CIVIL ACTION NO.

RECEIPT # 55324
AMOUNT $ 150
SUMMONS ISSUED YES
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. TDM
DATE 4/16/04

**COMPLAINT**

**Introduction**

1. This is an action arising under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. ("ERISA"), to recover benefits due under an Employee Benefit Plan, for full disclosure of requested information, and to recover reasonable costs and attorney's fees as provided by ERISA.

**Jurisdiction and Venue**

2. This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. Under Section 502(f) of ERISA, 29 U.S.C. § 1132(f), this Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3. Venue is properly had in this district pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that the Plaintiff is a resident in this district, and has suffered damage and harm in this district by the conduct of the Defendant; the Group Policy at issue (#19100) is

administered in this district; the Defendant conducts substantial business in this district; and pursuant to 28 U.S.C. § 1391(b), the cause of action arose in this district.

## The Parties

4. The Plaintiff, Dawn M. Greeley, ("Plaintiff") is an individual residing at 16 Old Ridge Hill, Chilmark, Massachusetts. Plaintiff is presently 55 years of age, with a date of birth on August 29, 1948.

5. The Defendant, The Prudential Insurance Company of America ("Defendant") is, upon information and belief, a national insurance company with a principal place of business at 751 Broad Street, Newark, New Jersey. Upon information and belief, the Defendant is licensed by the Commonwealth of Massachusetts Division of Insurance to do business in the Commonwealth, and does, in fact, conduct substantial business in the Commonwealth.

6. The Defendant issued a group Long Term Disability policy (Group Policy #19100), which policy constitutes, is a part of, or was issued pursuant to a Long Term Disability Plan governed by ERISA (the "Plan"). The Defendant is an Administrator and a Fiduciary of the Plan. The Plaintiff is a covered person under the terms of the Plan.

## Facts

7. The Plaintiff earned a Bachelor of Science degree from Simmons College in economics and political science, and has attended numerous professional training seminars relating to high technology manufacturing management and personnel development.

8. The Plaintiff began working for Digital Equipment Corporation ("Digital") in 1971, as a Sales Analyst working out of its Sales and Service Headquarters. She was promoted the next year, 1972, to the position of Sales Analysis Manager, working at the same location.

9. In 1974, the Plaintiff became Materials Manager at Digital's Manufacturing Headquarters, a position which she held until 1977, when she became OEM Systems Business Manager at Digital's Westminster, Massachusetts facility.

10. The Plaintiff remained in that position until 1980, when she returned to Digital's Manufacturing Headquarters as Low End Planning Manager, a position she held for three years. In 1983, she became Low End Business Center Manager at Digital's Marlborough, Massachusetts facility, a position she held for two years.

11. In 1985, the Plaintiff returned to Digital's Sales and Service Headquarters as Area Operations Manager. From there, in 1987, she returned to the Manufacturing Headquarters, where she held the position of Manufacturing Strategic Resources Manager until 1989. In this position, the Plaintiff managed and directed certain manufacturing operations, was responsible for production operations and control, materials management, quality control, and manufacturing engineering, among other things.

12. Plaintiff's position of Manufacturing Strategic Resources Manager at Digital required a great deal of physical activity, both inside and outside the facility where her office was located. It was often necessary for Plaintiff to go to the plant floor, both at her facility and at other sites, and to interact with lower level supervisory personnel, as well as top level managers and officers. In addition to frequent travel to other sites within New England and the rest of the United States, it was sometimes necessary for Plaintiff to travel internationally. Plaintiff's work week was typically 50-70 hours long.

13. In the fall of 1987, Plaintiff began to suffer debilitating pain which was initially centered in her jaw.

14. In 1988, she was admitted to Massachusetts General Hospital ("MGH") for temporomandibular joint ("TMJ") surgery, but it did not resolve the pain. Following surgery, the facial pain team providing her care at the MGH told Plaintiff that there was no further medical treatment available to reduce the pain, and referred her to the Boston Pain Center.

15. The Boston Pain Center informed the Plaintiff that she would never be rid of the pain, and that she would have to modify her lifestyle in order to live with it. The Boston Pain Center directed her to continue the exercise and meditation which she had begun as part of her program at the Center, and begin engaging in creative activities which would distract her from her pain.

16. Despite following these instructions, and seeking advice from other health care providers, the Plaintiff experienced no relief from pain. On or about April 9, 1989, after seventeen years of service, the Plaintiff discontinued working at Digital, due to her total disability.

17. On or about October 7, 1989, the Defendant approved and began paying to the Plaintiff long term disability benefits. The "initial phase" of coverage, as defined in the Plan, terminated on October 7, 1991.

18. In order to receive continued benefits beyond the initial phase of the Plan, the Defendant has informed her that she must satisfy Part (1)(b) of the policy's definition of "total disability," which provides, in relevant part: *"[y]ou are not able to perform, for wage or profit, the material and substantial duties of any job for which you are reasonably fitted by your education, training, or experience."* The policy further provided that *"if your disability, as determined by Prudential, is caused at least in part by a mental, psychoneurotic or personality disorder, benefits are not payable for your Disability for more than 24 months."*

19. By letter dated December 21, 2000, the Defendant informed the Plaintiff that it had determined that she did not "meet the criteria of [t]otal [d]isability" and that Defendant had "terminated [her] claim effective January 1, 2001" but would provide benefits through March, 2001, "as a measure of assistance."

20. The crux of Defendant's determination that Plaintiff was not totally disabled was Defendant's characterization of Plaintiff's job at Digital as administrative and sedentary in nature, a determination that is not supported by the evidence, and is arbitrary and capricious.

21. Defendant relied on an opinion by a Dr. Robert Pick that he "believed" that Plaintiff may be unable to work due to "behavior issues and self perception," and a subsequent consultation with a Dr. Don Lipsett who acknowledged that "additional information . . . would be beneficial to obtain clarification...," yet opined that Plaintiff suffered from "Somatoform Pain Disorder or Somatoform Disorder."

22. Defendant also relied on purported surveillance of Plaintiff in November and December, 1997 and in August, 2000 which Defendant concluded demonstrates that Plaintiff is "very active in her community and [has] a level of functioning that surpasses the physical requirements of sedentary work," a determination that is not supported by the evidence, and is arbitrary and capricious.

23. Defendant also relied on a review of the Plaintiff's medical records on December 16, 2000, by Dr. Gwen Brachman, who observed, wrongly, that "records from treating therapists do not include physical examinations or functional assessments."

24. Dr. Brachman ignored records in Defendant's possession such as Lisa Gross' numerous physical examinations of the Plaintiff in 1995 indicating that the Plaintiff's condition "continues to cause significant limitation in daily functional activities . . . ;" the conclusion of Dr.

Thomas C. Michaud, who treated Plaintiff on a weekly basis in 1995, that Plaintiff's pain "is most likely related to a pain cycle between her suboccipital muscles and TMJ" for which she underwent surgery in 1988 – a conclusion based on physical examination and functional assessment; the conclusion of Matilde Flores, based upon physical examinations and observations, that the Plaintiff could not "perform the kind of stressful, high level performance job she used to have;" the observation by Gateway Healthcare Associates in 1991 that the Plaintiff could barely open her mouth; and the opinion of Jan Powers LaGuardia, who saw the Plaintiff once a week for fibromyalgia, and wrote on September 8, 2000 that the Plaintiff "exhibits soft tissue restrictions in her cervical, thoracic and lumbar regions with the left upper quadrant being most involved. She also exhibits joint instability primarily in her lumbar and sacroiliac region."

25.  Following receipt of Defendant's December 21, 2000 letter, the Plaintiff announced her intention to appeal, and requested information about the Defendant's appeal procedures. The Defendant responded by letter dated February 14, 2001. By letter dated March 7, 2001, the Plaintiff requested a copy of her entire LTD claim file, and all other documentation that the Defendant has used to render a determination on her claim. By letter dated April 3, 2001, the Defendant forwarded what it represented to be the entire LTD claim file, and other documentation upon which it had relied. Defendant did not produce all documentation that was requested.

26.  By letter dated April 25, 2001, Plaintiff wrote to Defendant asking about some of the statements contained in Defendant's December 21st letter denying benefits, and requesting additional documents and materials that were referenced in the letter, but had not been provided, including but not limited to surveillance tapes.

27. By letter dated June 8, 2001, the Defendant responded to Plaintiff's letter, enclosed some additional documentation, and promised to forward the surveillance videos under separate cover. By letter dated June 9, 2001, Defendant forwarded one surveillance video. Defendant still did not produce all documentation requested.

28. On October 25, 2001, the Plaintiff appealed the Defendant's determination that she was no longer eligible for long term disability benefits, by writing to the Defendant's Appeals Review Unit, pursuant to procedural instructions from Defendant. As part of her appeal, the Plaintiff noted the Defendant's failure to produce all of the information Plaintiff had requested.

29. In further support of her appeal, the Plaintiff attached the entire LTD file which Defendant had provided to her; her own affidavit; the affidavits of Dorothy Terrell and Betty Baily, both of whom were colleagues of the Plaintiff at Digital; a letter from Paula H. Noe, a Brookline attorney who had served as Secretary for the Chilmark Town Affairs Council; a letter and records from Mark A. Piper, D.M.D., M.D., regarding his examination of and consultation with Plaintiff in November, 1987; and a report from renowned physician, Bernard S. Yudowitz, M.D., J.D., regarding his April, 2001 psychiatric and chronic pain evaluation of the Plaintiff.

30. As indicated in the affidavits of Plaintiff, Dorothy Terrell and Betty Baily, Plaintiff's position at Digital was not sedentary, but required considerable physical activity.

31. As indicated in the letter from Paula Noe, Plaintiff's service on the Chilmark Town Affairs Council, for which she received no compensation, consisted of her attendance at 2 meetings in 1997, 1 meeting in 1998, 1 meeting in 1999, 0 meetings in 2000, and contacting a local taxi service to provide transportation to children attending the summer program when the

program's van suddenly broke down. Plaintiff's service on the Council did not require physical activity, and does not detract from her claim of total disability

32. The purported surveillance tape reveals the Plaintiff sitting as a passenger on a small Sunfish boat while her husband slowly sailed back and forth in a calm harbor on a summer morning. It does not reveal the Plaintiff performing any physical activity other than sitting.

33. The letter from Dr. Piper, and his medical report dated November 10, 1987, prior to Mrs. Greeley's surgery in 1988, also a part of the LTD file, indicates that his examination revealed, inter alia, x-rays showing "rotatory and translatory manipulation pain," "extremely limited movement of . . . mandibulor condyles," and "degenerative arthritic changes." According to Dr. Piper's records, hospitalization testing revealed "considerable irregularity of both joint spaces"; a "scarred and non-pliable meniscus"; and that the "left temporomandibular joint meniscus was completely sublexed." Defendant's determination to deny Plaintiff's benefits does not address or acknowledge these observations.

34. The report by Dr. Yudowitz, who is both an attorney and eminent psychiatrist, following a review of the Plaintiff's medical history and his conduct of an independent examination, concludes (as did Ms. LaGuardia) that Mrs. Greeley suffers from fibromyalgia and that in his opinion, "she is not able to perform the material and substantial duties of her occupation . . . [or] the substantial duties of any job for which she is reasonably fitted by her education, training or expertise."

35. The conclusions of Dr. Yudowitz, Ms. LaGuardia, Ms. Gross, Dr. Michaud, Matilde Flores, Dr. Piper, Massachusetts General Hospital and the Boston Pain Center, support the Plaintiff's claim that she is unable to work at her prior job, or at any other job which is suitable for her, and that she is entitled to a continuation of her long term disability benefits.

Only Dr. Brachman opined otherwise and, her opinion is not supported by the record in this matter.

36. Nevertheless, by letter dated January 14, 2002, the Defendant denied Plaintiff's first request for reconsideration.

37. The Defendant rejected Dr. Yudowitz' opinion, characterizing it as out of his field of expertise, and reaffirmed its earlier conclusion that the Plaintiff is physically capable of performing the material and substantial duties of a sedentary occupation on a sustained and gainful basis.

38. In further support of its position, the Defendant opined that the surveillance "activities document her being out of the home, socializing with peers, shopping, and boating," and asserts that the Plaintiff herself admitted that she attends art classes and does gardening.

39. Curiously, the Defendant concedes that "[i]n our initial decision, we indicated that her occupation was sedentary in nature. Upon reviewing the additional information submitted with your appeal, we have determined that Ms. Greeley's occupation was not sedentary in nature."

40. In its January 14, 2002 letter, the Defendant suggested for the first time, that its Medical Director, whom it did not identify, had reviewed the Plaintiff's medical records, and believed that the following "sedentary" positions would be suitable for the Plaintiff: Director, Records Management; Contract Administrator; Manager, Sales; and Manager, Reports Analysis.

41. The Defendant reached this conclusion in spite of evidence in its records describing that in the position at Digital, the Plaintiff "manages and directs . . . multiple manufacturing facilities," and was responsible for "production, operations and control, materials management, quality control and manufacturing engineering." Her responsibilities included,

inter alia, organizing staff and developing personnel resources, and interacting with customers and representing the company. She was responsible for revenues of $75-$100 million, expenses of $10-$20 million, and assets of $25-$75 million; and she had an "indirect opportunity to affect $500 million or more." The records further indicate that the Plaintiff "typically oversees multiple locations;" has "[c]ontacts inside and outside Digital [which] typically involve senior individuals"; and that she may manage between 50 and 200 employees "or more."

42. The Plaintiff's position at Digital called for her to solve "very complex technical issues across multiple disciples and "unique" problems. It required a "mastery to state-of-the-art technical, functional, or business knowledge"; and "in depth knowledge in a specialized area." The Plaintiff's position at Digital required rigorous effort, extensive travel, attendance at geographically dispersed meetings and constant action and interaction.

43. None of the positions which the Defendant proposed in its letter dated January 14, 2002, constitute "job[s] for which [the Plaintiff] is reasonably fitted by [her] education, training or experience."

44. The evidence in Defendant's LTD file demonstrates that the Plaintiff was not "able to perform for wage or profit the material and substantial duties of any job for which [she was] reasonably fitted by [her] education, training or experience."

45. By letter dated March 29, 2002, the Plaintiff submitted to the Defendant her second appeal. In support thereof, among other things, the Plaintiff submitted documents from Ms. Flores, a licensed acupuncturist, indicating that due to chronic pain, the Plaintiff had experienced a decrease in her level of functioning that would render her incapable of performing the duties of any job. The Plaintiff also submitted the results of a vocational evaluation by Emmanuel B. Green, Ph.D., who opines that due to her chronic pain, headaches, shoulder pain,

neck pain, wrist pain, and difficulties with concentration and attention, the Plaintiff has significant occupational limitations that would preclude her from performing *any* occupation for which she is reasonably fitted by her education, occupational background, training or experience."

46. By letter dated March 24, 2003, the Defendant denied the Plaintiff's second appeal, upholding its decision to terminate the Plaintiff's long term disability claim effective April 1, 2001.

47. As grounds for its decision, the Defendant asserted that additional materials submitted by the Plaintiff in support of her second appeal "do not document an impairment that would support an inability on Ms. Greeley's part to perform sedentary work."

48. Dr. Green, however, opined that the Plaintiff was "[t]otally [o]ccupationally disabled from performing any gainful work activity as a direct result of her experience of significant pain resulting from her present physical condition." The Defendant's disregard of Dr. Green's opinion is without basis.

49. The Defendant's March 24, 2003 decision did not disclose to the Plaintiff the grounds for its determination that she could perform certain sedentary work, nor did it disclose the identity of its "clinical team" or Medical Director, who apparently made such determination, nor did it indicate whether such persons were members of the Appeals Review Unit that considered the appeal itself. The Defendant's opinion is further bereft of any information to suggest that the Plaintiff was vocationally suited for the sedentary positions it identified, or that such positions were available to Plaintiff, given her residence in a sparsely populated region of an island.

50. Defendant's March 24, 2003 letter also suggests that its decision to uphold its earlier denial of benefits rested, at least in part, on its view that the Plaintiff's injuries are psychological, rather than physical.

51. Defendant has acted in a duplicitous and arbitrary manner by its lack of clarity in expressing the basis for its termination of the Plaintiff's benefits, by not providing to the Plaintiff all of the information upon which it has based its determinations, and by shifting the sands at every juncture as Plaintiff pursued her administrative appeal process.

52. The record does not support any reasonable conclusion that the basis for the Plaintiff's disability is psychological, rather than physical. In fact, Dr. Yudowitz expressly rejected such a conclusion.

53. Defendant's March 24, 2003 decision was arbitrary and capricious and against the weight of the record evidence submitted to the Defendant.

54. By letter dated July 10, 2003, the Plaintiff submitted her third appeal to the Defendant, directing it to Prudential's Appeals Committee (rather than the Appeals Review Unit that had reviewed the first and second appeals), as instructed by Defendant.

55. By letter dated January 9, 2004 (erroneously dated January 9, 2003), the Defendant denied the Plaintiff's third appeal, once again upholding its decision to terminate the Plaintiff's long term disability claim, effective April 1, 2001.

56. The Defendant asserts that as part of its consideration of the Plaintiff's third appeal, it forwarded the Plaintiff's medical file to a "consulting physician." The Defendant has not identified the name of this "consulting physician" nor produced any written report, records or documents related to this alleged consult – notwithstanding the Plaintiff's ongoing requests for all documentation relating to the Defendant's decision to terminate her benefits.

57. The Defendant acknowledges in the letter that "Ms. Greeley has a history of chronic facial and musculoskeletal pain for the past 18 years or more. She has seen a facial surgeon who documented arthritis of the temporomandibular joint. She saw a vocational psychologist who concluded that she was unable to work because of the effects of her chronic pain. She saw a psychiatrist who concluded that she had fibromyalgia." The remainder of the letter does little more than restate the unsupported conclusions reached in Defendant's denial of the Plaintiff's first and second appeals.

58. Notwithstanding all the above, the Defendant relied on the review of its own, unnamed "consulting physician" in determining to uphold its earlier decision terminating benefits. As such, this decision is similarly arbitrary and capricious. The letter indicates that "the decision on her claim is final and cannot be further appealed."

## COUNT I
### (ERISA Section 502(a)(1)(B) -- Claim for Benefits Under the Plan)

59. The Plaintiff repeats and realleges paragraphs 1-58 and incorporates them as if fully set forth herein.

60. The Defendant timely received the Plaintiff's application for long term disability benefits under the Plan.

61. The Plaintiff has fully complied with all the material terms and conditions of the long term disability policy issued by the Defendant, on her part to be performed.

62. The Defendant terminated the Plaintiff's entitlement to benefits, effective April 1, 2001.

63. The Plaintiff timely, and in compliance with Defendant's internal appeal process, appealed the Defendant's denial of benefits on or about October 25, 2001. The Defendant affirmed its termination of benefits by letter dated January 14, 2002.

64. The Plaintiff timely, and consistent with Defendant's internal appeal process, appealed for a second time the Defendant's denial of benefits on or about March 29, 2002. The Defendant affirmed its termination of benefits by letter dated March 24, 2003.

65. The Plaintiff timely, and consistent with Defendant's internal appeal process, appealed for a third time the Defendant's denial of benefits on or about July 10, 2003. The Defendant affirmed its termination of benefits by letter dated January 9, 2004 (erroneously dated January 9, 2003).

66. The Defendant wrongfully terminated the Plaintiff's claim for long term disability benefits.

67. The Defendant's termination of Plaintiff's claim was not supported by the record, and was arbitrary and capricious.

68. The Plaintiff has suffered and continues to suffer damages on account of Defendant's actions.

## COUNT II
### (ERISA Section 502(c) – Breach of Duty of Disclosure)

69. The Plaintiff repeats and realleges paragraphs 1-68 and incorporates them as if fully set forth herein.

70. The Plaintiff has made timely and repeated demands prior to and during the pendency of her long term disability benefits discontinuance review for the disclosure of

specifically requested information pursuant to Section 101(a) of ERISA, 29 U.S.C. § 1021(a), et seq.

71. Despite said written demands, the Defendant has unduly delayed in furnishing all the requested materials required of them.

72. The Defendant is liable to the Plaintiff in the amount of $100 per day for each violation, after the thirty day period, beginning with Plaintiff's first request on January 21, 2001, and continuing on each and every day hereafter during which the Defendant fails to produce the required and requested materials.

73. The Plaintiff has suffered and continues to suffer damages on account of Defendant's actions.

**WHEREFORE**, Plaintiff, Dawn M. Greeley, requests that the Court:

i. Order, adjudge and decree that the Plaintiff is totally disabled, under the terms of the policy and/or Plan, and that Defendant is obligated to pay to Plaintiff all amounts due her pursuant to the provisions of the long term disability policy and/or Plan (past, present and future);

ii. Order, adjudge and decree that the Defendant is obligated to forthwith to make full disclosure to and provide Plaintiff with copies of all materials and information previously requested by the Plaintiff but never produced;

iii. Order, adjudge and decree that the Defendant is obligated to forthwith pay to Plaintiff $100 per day, or such other amount as determined by the Court, for each and every day that demanded disclosure was delayed beyond the thirty day period beginning January 21, 2001, as allowed by Section 502(c)(1) of ERISA, 29 U.S.C. § 1132(c)(1) et seq;

iv. Order, adjudge and decree an award to the Plaintiff of the costs of this action and reasonable attorney's fees and expenses, as allowed by Section 502(g) of ERISA, 29 U.S.C. § 1132(g);

v. Order, adjudge and decree such other and further relief as this Court deems just and proper.

**PLAINTIFF CLAIMS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

DAWN M. GREELEY,

By her attorneys,

_____
Richard D. Glovsky, BBO# 195820
Jeffrey A. Dretler, BBO# 558953
PRINCE, LOBEL, GLOVSKY & TYE LLP
585 Commercial Street
Boston, MA 02109
(617) 456-8000

Dated: April 15, 2004