UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAWN M. GREELEY,

Plaintiff,

v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

Defendant

CIVIL ACTION NO.

04-10772 DPW

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE RECORD

### INTRODUCTION

Plaintiff, Dawn M. Greeley ("Greeley"), initiated this action against Defendant, the Prudential Insurance Company of America ("Prudential"), under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) (Count I) & 1133(c) 1001-1461 (Count II), for Prudential's wrongful termination of her Long Term Disability (LTD) benefits and for improperly withholding relevant evidence during the administrative appeal process. Judgment should enter for Greeley on Count I, because the "record"[1] in this case demonstrates that Prudential arbitrarily and capriciously terminated her LTD benefits, ignoring the overwhelming evidence that

---

[1] The Plaintiff refers to the "record", because, it contends, Prudential consciously withheld critical information from the Plaintiff during the administrative appeals process. Thus, the Plaintiff has submitted her "record"—*i.e.*, that which Prudential made available to her during her administrative appeals process. Citations to Plaintiff's Statement of Undisputed Material Facts will be in the format PSUMF ¶ __.

Greeley suffered from a condition known as fibromyalgia which rendered her totally disabled.

Judgment should enter for Greeley on Count II because, during Greeley's three administrative appeals, Prudential ignored Greeley's repeated requests and withheld relevant documents and other materials, undermining Greeley's right to a full and fair review of her claim. Those documents, only some of which Prudential has now produced to the Court, reveal a consistent pattern of bias against Greeley and a concerted effort by Prudential to sabotage her claim by convincing or otherwise predisposing its "independent" physicians to submit inaccurate and prejudicial medical reports.

## FACTS[2]

I.    Greeley's Position At Digital

Dawn M. Greeley, a Simmons College graduate, began working at Digital Equipment Corporation ("Digital") in 1971 as a sales analyst. PSUMF ¶¶1-2. Over the course of the next sixteen years, Greeley held various high-level positions at Digital. Id. ¶2. In 1987, she was promoted to a senior level position as "Manufacturing Strategic Resources Manager" at Digital's Manufacturing Headquarters. Id. This position carried with it a great deal of responsibility, including managing and directing several manufacturing facilities with direct responsibility for more than one hundred million dollars in revenues, expenses and assets. Id. ¶¶4-9.

Greeley's work was neither sedentary nor administrative in nature; it was extremely demanding—a typical work week for Greeley lasted between fifty and seventy hours. Id. ¶¶10-11. As part of her duties, she frequently traveled to different Digital

---

[2] The facts recited in this section are derived from the material Prudential provided to Greeley prior to her first appeal and which Greeley returned bates stamped to Prudential appended to her first appeal. PSUMF ¶83.

facilities locally, nationally, and internationally, often moving about the factory floors, interacting with employees, and attending meetings. Id. ¶10. In short, she was constantly "on the go." Id.

II.    Greeley Is Diagnosed and Unsuccessfully Treated For Debilitating Facial Pain.

In the fall of 1987, Greeley began to suffer debilitating pain in her jaw. Id. ¶14. She was diagnosed with a variety of different physical irregularities, including "degenerative arthritic changes" among others. Id. ¶15. Her doctor, Mark A. Piper, M.D., opined that "arthritic changes would be expected to be progressive" and recommended surgery. Id.

In 1988, Greeley underwent tempormandibular (TMJ) surgery at Massachusetts General Hospital (MGH). Id. ¶16. However, the surgery was unsuccessful in relieving Greeley's pain. Id. After treatment with the facial pain team at MGH, Greeley was referred to the Boston Pain Center. Id. After a course of treatment there, the Boston Pain Center advised Greeley that her pain was unlikely to subside, and they instructed her to continue on a specialized exercise and meditation regimen, to engage in creative, low-stress activities that would distract her, and generally change her lifestyle in order to minimize and cope with her chronic pain. Id. ¶17.

III.    Greeley Stops Working, Changes Her Lifestyle, Seeks and Receives Ongoing Treatment, But Continues to Suffer.

In August of 1989, Greeley applied to Prudential for long-term disability benefits. Id. ¶18. Prudential approved her application on October 7, 1989, based, in part, on a diagnosis of "chronic facial pain." Id. ¶¶18-19.

From 1989 through 1995, following the recommendations of her doctors, Greeley altered her lifestyle and received a variety of treatments for her condition, yet was unable

to effectively alleviate her physical suffering. Id. ¶¶21-26. She engaged in painting and

garden design as low-stress activities designed to distract her form the pain, and spent

several hours daily on a specialized exercise program guided by her physical therapist.

Id. ¶22.

In addition, Greeley treated with a variety of specialized practitioners. Id. ¶¶21-

26. Dr. Thomas C. Michaud, Greeley's chiropractor, treated her weekly for "chronic

upper cervical and trapezius pain" that was "most likely related to a pain cycle between

her suboccipital muscles and TMJ." Id. ¶21. Lisa Gross, Greeley's physical therapist,

treated Greeley weekly, focusing on "relieving the severe muscle tension that exists in the

craniomandibular, craniovertebral, cervical spine and thoracic spine regions." Id. ¶¶22-

23. In 1995, she noted that Greeley's condition "continues to cause significant limitation

in daily functional activities" and that progress was slow "[b]ecause of the high

sensitivity and irritability of myofascial trigger points." Id. ¶22-23. Medical records

from Ms. Gross document physical evaluations of Greeley's aggravated "trigger points."[3]

Id. ¶23. Ms. Gross opined that Greeley was unable to return to work. Id. ¶22. Matilde

Flores, Greeley's alternative health practitioner, stated that Greeley suffered from

---

[3] Trigger points are associated with fibromyalgia, a disease for which Greeley was later diagnosed.
"Fibromyalgia is a disorder characterized by widespread musculoskeletal pain, fatigue and multiple tender
points. National Institutes of Health, Questions and Answers About Fibromyalgia, at
http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm (December 1999)." Cook v. Liberty Life
Assur. Co., 320 F.3d 11, 15 n.4 (1st Cir. 2003). It "[is] a common, but elusive and mysterious, disease…
Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its
symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia.
The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and -- the only symptom that
discriminates between it and other diseases of a rheumatic character -- multiple tender spots." Hawkins v.
First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 916 (7th Cir. 2003) (internal citations
omitted).

[5] This is typical for patients with fibromyalgia. The informational website to which the First Circuit cited
in Cook, 320 F.3d at 15, n.4, states that "[b]ecause there is no generally accepted, objective test for
fibromyalgia, some doctors unfortunately may conclude a patient's pain is not real."
http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm#fib_a

"tremendous tension in head, neck [and] shoulders" and documented Greeley's inability to fully open her mouth, resulting in chronic pain throughout the face, shoulders and back, migraine headaches, and an inability to sleep due to pain. Id. ¶¶25-26.  She concluded that Greeley "is in severe chronic pain which affects her ability to concentrate and her capacity to deal with daily life activities" and that she could not "perform the kind of stressful, high level performance job she used to have." Id. ¶25.

IV.    Prudential Tries To Build A Case to Terminate Greeley's Benefits

In 1995, Prudential began a process of surveillance and investigation designed to build a case to allow it to terminate Greeley's benefits. Id. ¶¶46-51.  Prudential solicited reports and medical records from Greeley's treating practitioners. Id. ¶20.  In addition, Prudential subjected Greeley to an examination conducted together by Drs. Robert Pick and Ronald Donelson—both orthopedic surgeons. Id. ¶27.

Dr. Donelson documented a host of Greeley's symptoms, including her chronic head, back and neck pain, as well as physical limitations caused by her disability. Id.¶ 28. Dr. Donelson confirmed that he "[did] believe . . . she is experiencing these symptoms" and that she is "truly disabled." Id. ¶29.  Although unable to provide an orthopedic diagnosis, Dr. Donelson hypothesized that her condition may be caused by an underlying psychological condition.[5] Id. ¶¶30-31.  Dr. Donelson, rendered this opinion without performing any objective psychological testing or making a psychiatric diagnosis. Id.

Dr. Pick was also unable to diagnose Greeley's condition. Id. ¶32.  Indeed, he did not even "address the issue of the described temporomandibular joint symptamology"— the very condition for which Greeley received disability benefits. Id. He stated he "was

unable to objectively substantiate" an *orthopedic* condition that would keep Greeley from working. Id. ¶32.

On September 21, 1995, G. Richard Smith, M.D, a psychiatrist, provided a report to Prudential in response to its request[6] to review Greeley's medical records and render an opinion whether her condition was psychological in nature. Id. ¶¶34-35. Dr. Smith was unable to diagnose Greeley's condition as psychiatric in origin. Id. ¶38. Prudential then subjected Greeley to a psychiatric examination by Don R. Lipsitt, M.D. Id. ¶40. Despite Prudential's communication to Dr. Lipsitt that Greeley had a "long history of chronic somatic complaints,"[7] his findings were largely inconclusive. Id. ¶¶41, 44-45. Dr. Lipsitt reported that his examination did not "offer insight into possible psychological understanding of somatized conditions"; that "[i]t is very difficult to make a positive assessment of this patient psychiatrically"; and that additional information would be helpful in making a positive diagnosis." Id. ¶¶43-44. Nonetheless, he listed "Somatoform Pain Disorder or Somatoform Disorder NOS" as his diagnosis on the report.[8] Id. ¶45. It is not clear whether this diagnosis was based on Dr. Lipsitt's examination, or whether he merely restated what Prudential apparently advised him before his examination—that Greeley's complaints were somatic. See id. Neither Prudential nor Dr. Lipsitt requested that Greeley provide additional information to enable him to make a positive diagnosis.

---

[6] Despite repeated requests for all relevant documents, PSUMF ¶¶78-79, 81, 106, 120, Prudential never provided a record of that request to Greeley and it is not included in the Prudential's proposed administrative record.

[7] Prudential has failed to produce a record of this communication to Dr. Lipsitt. See *infra*, § VII. Moreover, not one practitioner had ever characterized or diagnosed Greeley's complaints as somatic.

[8] A somatoform disorder is "a psychological disorder in which the physical symptoms suggest a general medical condition and are not explained by another condition…" Taber's Cyclopedic Medical Dictionary 2004 (F.A. Davis Co., 19th ed. 2001).

Apparently concerned that its medical team would be unable to provide sufficient evidence to justify Prudential's termination of benefits, Prudential twice conducted surveillance of Greeley in November and December of 1997. Id. ¶¶46-51. The surveillance yielded no evidence that supports a finding that Greeley is not disabled. Id. ¶¶47-51. During the three days of surveillance, Greeley left her residence for less than 3 ½ hours total.[9] Id. ¶¶47, 50. Prudential learned that Greeley painted, but only "as a hobby," and that three of her paintings were offered for sale at a local art exhibit but that none of the gallery employees had ever seen or even heard of Greeley. Id. ¶51. On Greeley's only trip to a local store, she was accompanied by a companion who carried the shopping bag out of the store while Greeley proceeded empty-handed. Id. ¶49.

In 1998, Prudential reviewed additional reports and records from the Dana Farber Cancer Institute,[10] Matilde Flores, Jan Power LaGuardia, R.P.T., Greeley's new physical therapist, and Nancy Berger, her new chiropractor. Id. ¶¶52-58. Those reports continued to document Greeley's essentially unchanged debilitating chronic pain. Id. Ms. Laguardia treated Greeley weekly for pain associated with fibromyalgia, noting that her cancer treatment "significantly affected her fibromyalgia causing setbacks in her progress." Id. ¶¶56-58. Her many evaluations documented in the medical records chronicle various "soft tissue restrictions," "joint instability" and "trigger points." Id. ¶57.

In August of 2000, Prudential conducted further surveillance of Greeley. Id. ¶¶59-62. Greeley and her husband were observed sailing in a "small sunfish-type boat." Id. ¶60. A videotape shows the couple slowly sailing back and forth in a calm harbor,

---

[9] The report indicates that video surveillance was performed. Prudential has never provided Mrs. Greeley with a copy of this surveillance video despite repeated requests. PSUMF ¶48, and *infra* n.16.
[10] Mrs. Greeley was diagnosed and treated for breast cancer in 1997. PSUMF ¶57.

with Greeley seated the entire time, as her husband maneuvers the boat.  Id. ¶61.

Prudential also learned that Greeley was one of forty-eight members of the Executive

Committee Chilmark Town Affairs Counsel.  Id. ¶62.

In late 2000, Prudential hired Dr. Gwen O. Brachman to review Greeley's

medical records.  Id. ¶64.  Dr. Brachman was not provided with any medical records

dated prior to 1991, including those relating to Greeley's TMJ surgery and related

treatments and diagnoses.[11]  Id. ¶65.  Dr. Brachman's report is patently biased.  Id. ¶¶66-

75.  Despite voluminous treatment records replete with documented evaluations of

Greeley's debilitating condition, including persistent migraine headaches, neck, face and

back pain, sensitivity to noise and smells and the inability to sleep and concentrate, Dr.

Brachman cherry-picked a few isolated adverse notations from the records to include in

her report.  Id.

For example, Dr. Brachman characterized Ms. Flores treatment as lacking any

"physical exams" and producing physical improvements, despite Ms. Flores' clear

documentation to the contrary.  Id. ¶67.  Similarly, Dr. Brachman summarizes Ms. Gross'

treatment as lacking any "real physical examinations or functional assessments" and

producing improvements.  Id. ¶68.  However, Ms. Gross clearly documented "severe

muscle tension" causing "significant limitation in daily functional activities."  Id. ¶¶22-

23.  Similarly, ignoring four years of records documenting Ms. LaGuardia's treatment of

Greeley for chronic pain from fibromyalgia, Dr. Brachman stated that "there are no

functional assessments documented" while she highlighted one record from 1996

indicating Greeley went "on a road trip" where she was sitting and hiking.  Id. ¶71.  Dr.

Brachman summarily dismissed Ms. LaGuardia's statement concerning fibromyalgia,

---

[11] One can only speculate as to reasons Prudential did not provide Dr. Brachman with those records.

stating that "the diagnosis of fibromyalgia was never made or documented in any of the treatment records," id. ¶75, even though Ms. Gross clearly documented Greeley's sensitive trigger points. Id. ¶¶22-23.

Just as she ignored the mountain of medical evidence documenting Greeley's chronic disabling pain associated with fibromyalgia, Dr. Brachman overemphasized the psychiatric comments by Drs. Pick, Donelson, and Lipsitt. Id. ¶70. Each of those doctors' reports was largely ambiguous and inconclusive as to whether a psychiatric condition was present. Id. ¶30-33; 43-45. Indeed, those doctors were unable to determine whether a physical condition was the true cause of Greeley's symptoms. Id. Nonetheless, Dr. Brachman stated in conclusive fashion that a review of those reports compelled the conclusion that Greeley had a psychiatric condition causing her disability. Id. ¶70, 74. Similarly, Dr. Brachman characterized the surveillance reports as demonstrating that Greeley leads an active lifestyle such that she is capable of performing more than a sedentary job. Id. ¶73. As described above, however, a fair view of the surveillance reports shows that Greeley had been largely inactive and did not shed much, if any, light on her ability to return to work. See id. ¶¶46-51; 59-62.

Ignoring all of the contrary medical opinions by Greeley's treating practitioners and Dr. Donelson that Greeley was disabled and unable to return to work, Dr. Brachman stated that "[t]here is no indication . . . Ms. Greeley is physically unable to perform the essential functions of the job." Id. ¶74.

## PROCEDURAL HISTORY

I.    Prudential Terminates Greeley's Benefits

On December 21, 2000, Prudential terminated Greeley's LTD claim, citing and quoting from the long term disability policy (the "Policy"),[12] which provides in relevant part:

> 'Total Disability' exists when Prudential determines that all of these conditions are met:
>
> (1)  Due to sickness, or accidental injury, both of these are true:
>
> (a)  You are not able to perform, for wage or profit, the material and substantial duties of your occupation.
>
> (b)  After the Initial Duration of a period of Total Disability, you are not able to perform, for wage or profit, the material and substantial duties of any job for which you are reasonably fitted by your education, training, or experience. The initial duration is [24 months].
>
> * * *
>
> In addition, if your Disability, as determined by Prudential, is caused at least in part by a mental, psychoneurotic or personality disorder, benefits are not payable for your Disability for more than 24 months.

Id. ¶12.

In terminating Greeley's benefits, Prudential claimed that (i) her position at Digital was administrative and sedentary; (ii) its examinations demonstrated she is capable of sedentary work; and (iii) the surveillance reports indicated "that [Greeley is] very active in her community and [has] a level of functioning that surpasses the physical requirements of sedentary work." Id. ¶77. In addition, Prudential claimed it had

---

[12] Prudential never provided the actual policy to Greeley, but merely quoted it in its denial letters. PSUMF ¶13.

determined, as of February 1996, that Greeley's benefits were limited to two additional years under the benefit limitation for disabilities caused by psychiatric disorders.[13] Id.

II.    Greeley Requests Prudential's Records and Files Her First Appeal

On January 21 and March 7, 2001, Greeley and her counsel requested all materials upon which Prudential relied in terminating her claim, including a copy of the Policy. Id. ¶¶78-79. In response, on April 3, 2001, Prudential provided "Greeley's LTD claim file and the documentation that was used to render a determination on her claim." Id. ¶80. After reviewing the documents Prudential provided, it was clear the file was incomplete. Id. ¶81. Accordingly, on April 25, 2001, Greeley requested the missing materials, specifically requesting seven items, including the job description upon which Prudential relied, documents containing statements Prudential attributed to Greeley, documentation supporting Prudential's contention that Social Security benefits had been denied, surveillance videotapes, an authorization to release medical records purportedly signed by Greeley, questions propounded by Prudential to Dr. Michaud and missing pages from the surveillance report. Id. Despite this request, Prudential failed to send documentation of Greeley's purported statements, a surveillance video, documents regarding the surveillance, Social Security benefits documentation, and the medical records' authorization. Id. ¶82. Prudential admitted it sent only those documents which it deemed relevant, and stated that "the file copy and surveillance videos include *all*

---

[13] This statement is belied by the fact that (1) Prudential never notified Mrs. Greeley of this determination until December 21, 2000; (2) they continued paying her benefits for nearly five years after that date; (3) in a January 29, 1998 letter to Mrs. Greeley, Prudential stated that it was only then "evaluating your claim to see whether the...benefit limitation applies", PSUMF ¶52  ; and (4) internal Prudential documents only recently revealed to the Court indicate that in March of 1996 Prudential "needed to review the possibility of applying the [limitation] on claim going forward." Id. ¶144.

*documents and information* on which our decision to deny benefits was based." Id.
(Emphasis added).

On October 25, 2001, following Prudential's internal appeal guidelines, Greeley
submitted her first appeal, attaching a bates-stamped copy of each document Prudential
had given her. Id. ¶83. Greeley pointed out that Prudential had still not provided her
with relevant materials, and argued that Prudential's failure in this regard had
undermined her ability to effectively appeal and was alone grounds for reversal of its
decision to terminate her benefits. Id. ¶84.

Substantively, Greeley provided additional materials for Prudential's
consideration, including proof her position on the Chilmark Town Affairs Counsel
consisted of attending a total of four meetings over the course of four years and proof that
her position at Digital was not administrative and/or sedentary. Id. ¶¶85-86. Greeley also
submitted updated reports from Ms. Flores and a report by Dr. Bernard S. Yudowitz,
M.D., J.D. Id. ¶¶89-94.

Dr. Yudowitz, a renowned medical doctor and psychiatrist, established the first
inpatient treatment center for chronic pain in Massachusetts and served as the Medical
Director of the Pain Management Unit and all pain services at that hospital from 1972-
1996. Id. ¶90. He conducted a complete review of Greeley's case, including a
comprehensive psychiatric and chronic pain evaluation. Id. ¶91-92. He concluded that
her disability was not psychological in origin. Id. ¶94. Rather, he diagnosed her with a
chronic physical condition known as fibromyalgia. Id. ¶92. He explained that Greeley's
unsuccessful TMJ surgery followed by years of pain progressively radiating diffusely
throughout her musculature (as specifically documented in the medical records) "is the

usual course of fibromylagia." Id. Dr. Yudowitz opined that a psychiatric diagnosis of
her condition was entirely inappropriate, as fibromyalgia typically produces secondary
psychological effects. Id. ¶94.

III.    Prudential Denies Greeley's First Appeal

On January 14, 2002, Prudential denied Greeley's first administrative appeal,
completely ignoring Greeley's argument concerning the improperly withheld claim
materials. Id. ¶95-96. Prudential related that Greeley's submissions had been evaluated
by its "clinical team and medical director" and that it had performed a "vocational
assessment." Id. ¶97, 101. Conceding that Greeley could not return to her former
position, id. ¶98, Prudential took the position for the first time that "the records do not
support total disability from" four newly identified "sedentary occupation[s]." Id. ¶99.
Prudential cavalierly dismissed Dr. Yudowitz's diagnosis of fibromyalgia, stating: "this is
out of Dr. Yudowitz' scope to make a diagnosis of Fibromyalgia as he is a Psychiatrist."
Id. ¶100. Thus, Prudential affirmed its decision to deny Greeley's claim because (1) it
had identified four sedentary positions in the Boston area which, according to Prudential,
"Ms. Greeley possesses the education, training and experience to perform,"[14] and (2) the
medical documentation in the file "suggests that Ms. Greeley may have a psychological
condition which is impacting her ability to return to work."[15] Id. ¶¶99-102. (emphasis
added).

Prudential did not provide Mrs. Greeley with any additional documentation
supporting its denial of her appeal. Id. ¶103. For example, it did not provide

---

[14] The standard set forth in the Policy is whether the claimant is "able to perform for wage or profit the material and substantial duties of any job for which [she is] reasonably fitted by [her] education, training or experience…" PSUMF ¶12 (emphasis added).
[15] The standard set forth in the Policy is whether the "disability, as determined by Prudential, is caused at least in part by a mental, psychoneurotic or personality disorder…" PSUMF ¶12 (emphasis added).

documentation of the "vocational assessment" or the purported "review[] with our
clinical team and medical director." Id.

IV.    Greeley Files Her Second Appeal

On March 29, 2002, Greeley filed her second administrative appeal. Id. ¶104. In
this appeal, Greeley contended that Prudential applied incorrect standards in evaluating
her claim, arbitrarily ignored the great weight of the evidence, and improperly set forth
new bases for the termination of Greeley's benefits predicated on new information that
was never provided to her. Id. ¶¶105-110. In support of this appeal, Greeley submitted
additional reports from Matilde Flores and Emmanuel Green, Ph.D. Id. ¶111. Ms. Flores
stated that because of Greeley's chronic pain "there is no doubt that she is incapable of
performing the duties of any job." Id. ¶112. Dr. Green performed a thorough vocational
evaluation of Greeley and concluded that "Greeley, at the present time, is **Totally
Occupationally Disabled** from performing any gainful work activity as a direct result of
her experience of significant pain resulting from her current physical condition" and that
her "functional impairments result in significant occupational limitations that preclude
her from … performing, on a sustained basis, the material and substantial duties of any
job for which she is reasonably fitted by her education, occupational background, training
or experience." Id. ¶113 (emphasis in original).

V.    Prudential Denies Greeley's Second Appeal

By letter dated March 24, 2003, Prudential denied Greeley's second appeal,
claiming that her claim had been terminated because of the psychiatric benefit limitation.
Id. ¶¶114-115. It deemed Dr. Green's report irrelevant, contending Greeley's disability
was psychological in origin. Id. ¶117. Prudential concluded that "we have found no

evidence of a sickness or accidental injury that would prevent Ms. Greeley from engaging in any occupation." Id. ¶118.

VI.    Greeley Files Her Third and Final Appeal

On July 10, 2003, Greeley filed with Prudential's full Appeals Committee her third and final appeal. Id. ¶119. In this appeal, Greeley documented Prudential's failures to provide materials upon which it based its decision, contending that those failures warranted reversal of the decision to terminate benefits. Id. ¶120. In response—nearly two and one half (2 ½) years and three appeals after the materials were first specifically requested by Greeley—Prudential provided one surveillance videotape, copies of documents relating to the surveillance, and the medical records' authorization signed by Greeley. Id. ¶121. Even this response, however, was incomplete, as Prudential continued to withhold the surveillance video from 1997,[16] documents containing statements Prudential attributed to Greeley, records and invoices pertaining to the surveillance and medical consultations, and the Policy Id. ¶122.

VII.    Prudential Denies Greeley's Third and Final Appeal

On January 9, 2004, Prudential denied Greeley's third and final appeal, claiming (i) "two psychiatrists have concluded that Greeley has a somatoform disorder," (ii) she could return to work because "she appears to lead an active life including painting and sailing," (iii) two orthopedic surgeons were unable to document an orthopedic condition; (iv) "there appears to be no documentation in these records that supports a physical

---

[16] The record is clear that Prudential has a second videotape in its possession that it, to this day, continues to withhold from Mrs. Greeley. For example, the investigator's report from November 5, 1997 states that he took video surveillance of Mrs. Greeley. Yet, Prudential has only produced one videotape. In addition, Prudential's correspondence in 2001 to Greeley and her counsel makes reference to surveillance videotapes. ("we are arranging to have copies of *the surveillance videos* sent to your attention"). Still, to this day, Mrs. Greeley has received only one videotape. Finally, in documents that Prudential is only *now* producing to the Court (but which have never been produced to Greeley), Prudential reveals that it was invoiced for a videotape from the investigator in 1997. PSUMF ¶123.

inability to perform the material and substantial duties of a sedentary or light work job," and (iv) a "Transferable Skills Analysis/Labor Market Survey"[17] based upon an unidentified "consulting physician's" file review and Dr. Green's Vocational Assessment concluded that Greeley "is expected to be reasonably employable in" several positions for which no description (apart from job title and salary range) was provided.  Id. ¶¶128-135.

VIII.   <u>Prudential Reveals In This Proceeding A Host of Additional Relevant Documents
Which Were Concealed From Greeley</u>

When Prudential filed its proposed administrative record with this Court, it included scores of documents which Prudential had never produced to Greeley, despite its representations during the appeals process that it had produced all materials upon which it had relied.  Id. ¶¶136-156 & Exh.A.  Included in those documents were the Policy (which Greeley had never been given), the unidentified "consulting physician's" report and vocational assessment Prudential relied upon in denying Greeley's final appeal, and medical journal articles.  Id. ¶¶137, 155, 139.  Moreover, Prudential revealed several previously undisclosed internal "SOAP" notes, which provide insight into Prudential's decisions and reveal that they were consistently applying the wrong standards to Greeley's claim and misconstruing the contents of Prudential's surveillance. Id. ¶¶140, 142145.

There are several additional highly revealing and incriminating documents within Prudential's previously withheld materials.  Id. ¶146-154.  For example, an internal Prudential email reveals that in 1995 it was discussing Greeley's claim with "Bob Pick" (Dr. Pick) and Dr. Donelson before their evaluations, and was instructing Dr. Pick what it wanted him to say in his report.  Id. ¶150. This email also suggests a concerted effort by

---

[17] Mrs. Greeley was not provided with any documentation or information concerning this analysis, except that which appears in Prudential's denial letter.

Prudential to cover its tracks in this regard by preparing a carefully worded letter to Drs. Pick and Donelson, leaving a paper trail that created the appearance of objectivity and impartiality.[18] Id. ¶151.

Other internal documents reveal similar efforts with regard to Drs. Lipsitt and Brachman. Id. ¶¶146-148, 152-154. These documents indicate that Prudential's Medical Director had several telephone conversations with Dr. Lipsitt before he performed his evaluation, "familiarized" him with Greeley's case and provided him with a "summary" of Greeley's condition. Id. ¶¶146. Although Prudential never produced this "summary" or any documentation memorializing these telephone conversations, Dr. Lipsitt's report states that Prudential told him Greeley's condition was somatic, despite the fact that no doctor had ever diagnosed her condition as such. Id. ¶147.

Similarly, a letter from Prudential to Dr. Brachman prior to her review of Greeley's records indicates that there had been previous communications between Prudential and Dr. Brachman; however, Prudential has never produced any documentation of those exchanges. Id. ¶152. In its letter to Dr. Brachman, Prudential told her that "Greeley is quite active in her community" (emphasis added), despite the fact that the surveillance belied this statement. Id. ¶153. Greeley, and this Court, are left to speculate as to what other undocumented falsehoods Prudential told Drs. Lipsitt and Brachman concerning Greeley's condition.

Finally, in what is a virtual "smoking gun," newly disclosed internal Prudential documents reflect that Dr. Lipsitt called Prudential and stated that Greeley "definitely has

_____

[18] This document was the only internal email contained in Prudential's proposed administrative record. Surely, there was substantially more internal correspondence, including additional emails, concerning Greeley's claim. Greeley can only speculate as to what additional incriminating evidence would be revealed had Prudential produced all internal correspondence regarding Greeley's claim.

a chronic pain syndrome – it is difficult to assess how much of that is

psychological/physical." Id. ¶148 (emphasis added). Thus, Prudential, in fact, knew Dr.

Lipsitt was unable to make a psychiatric diagnosis but that he "definitely" believed she

had a chronic pain syndrome. It also knew that Dr. Lipsitt's actual opinion was at odds

with the diagnosis related on his report. Id. ¶45. In addition, Prudential's letter to Dr.

Brachman in December of 2000 (which was never produced to Greeley) reveals that

Prudential actually knew Greeley had fibromyalgia, despite representing to Greeley that

there was "no evidence" she had a disabling condition. Id. ¶154. Prudential had

concealed all of this information from Greeley.

## ARGUMENT

I.     Count I: Prudential's Decision to Terminate Ms. Greeley's LTD Benefits Must Be Reversed Because It Was Unreasonable and An Abuse of Discretion

      A.     Standard of Review - Abuse of Discretion With "More Bite"

Where, as here, a plan administrator has discretion to determine eligibility for

benefits, a court reviewing an administrator's decision challenged under 29 U.S.C. §

1132(a)(1)(B) may uphold the decision only if it was "reasonable and supported by

substantial evidence" in the record. Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 212-

13 (1st Cir. 2004) (internal quotation marks omitted). After a "searching" review of the

administrative record, Radford Trust v. First Unum Life Ins. Co., 2004 U.S. Dist. LEXIS

10916, *30 (D. Mass. June 15, 2004) (Young, C.J.) (citing Recupero v. New England

Tel. & Tel., 118 F.3d 820, 827 (1st Cir. 1997)), the Court must reverse the decision if it

was "arbitrary, capricious, or an abuse of discretion." Gannon, 360 F.3d at 212-13.

This Court's review of Prudential's decision under the arbitrary and capricious

standard should be given "more bite"—if not reviewed *de novo*—because a genuine

conflict of interest existed during Prudential's decisions making process. Doyle v. The Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998). The Court must be mindful that "a finding of eligibility [by Prudential] means that [Prudential would have had] to pay benefits out of its own pocket." Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 418 (1st Cir. 2000); Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, (1989); Conrad v. Reliance Standard Life Ins. Co., 292 F. Supp. 2d 233, 236-237 (D. Mass. 2003). More importantly, however, there is substantial evidence in the record of a genuine actual conflict of interest.[19] Most notably, documents previously concealed from Greeley by Prudential now reveal that Prudential did not act impartially and was improperly motivated to terminate Greeley's benefits. Among other things, Prudential communicated with its "independent" physicians and told them what it wanted included in their reports. In addition, the documents reveal that Prudential sabotaged what should have been objective and impartial evaluations of Greeley's condition by those doctors, telling them in advance that Greeley's disability was merely a psychiatric

---

[19] "What would be required to show a genuine conflict of interest is not explicitly defined by the case law, although one might suppose that it would include evidence that claims examiners were being pressured by company managers to deny benefits claims." McLaughlin v. Prudential Life Ins. Co., 319 F. Supp. 2d 115, 125 (D. Mass. 2004); Pari-Fasano, 230 F.3d at 419 (level of scrutiny properly depends on "whether the circumstances indicated an improper motivation" by the insurer). See also, e.g., Johannssen v. Dist. No. 1 - Pac. Coast Dist., 292 F.3d 159, 176 (4th Cir. 2002) ("Conflict of interest may serve both to reduce the degree of deference a court will grant to a discretionary decision of a fiduciary and as a factor in the reasonableness inquiry"); Goldstein v. Johnson & Johnson, 251 F.3d 433, 435-436 (3d Cir. 2001) ("a more searching scrutiny of such discretionary decisions [is mandated] in situations where the impartiality of the administrator is called into question ... [if] the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case"); Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 343, n.2 (4th Cir. 2000) ("a court, presented with a fiduciary's conflict of interest, may lessen the deference given to the fiduciary's discretionary decision to the extent necessary to 'neutralize any untoward influence resulting from that conflict'"); Atwood v. Newmont Gold Co., 45 F.3d 1317, 1322-23 (9th Cir. 1995) (heightened scrutiny applies where the claimant provides "material, probative evidence . . . tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary"); Van Boxel v. Journal Co. Employees' Pension Trust, 836 F.2d 1048, 1052 (7th Cir. 1987) ("There may be in effect a sliding scale of judicial review of trustees' decisions-- more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is").

condition even though there was no support for this position.  Moreover, the documents

now provided to this Court reveal that Prudential concealed Dr. Lipsitt's actual diagnosis

that Greeley "definitely" had a "chronic pain syndrome" and that he was unable to

determine the cause of that disorder.  Prudential produced only Dr. Lipsitt's report, which

related precisely what Prudential had told him to relate—that Greeley had a somatoform

disorder—not what he truly believed.  Finally, Prudential mischaracterized evidence in its

possession, ignoring all of Greeley's compelling and definitive medical evidence in favor

of equivocal and patently biased reports from its own physicians.

This evidence clearly demonstrates that Prudential was biased, partial and acting

in bad faith, manifesting a genuine conflict of interest.  Therefore, the Court should

perform a much more searching—if not *de novo*—review of Prudential's decision.  Pari-

Fasano, 230 F.3d at 419 (level of scrutiny properly depends on "whether the

circumstances indicated an improper motivation" by the insurer); Doyle, 144 F.3d at 184

(stricter scrutiny where genuine conflict exists).  Under any level of scrutiny, however,

Prudential's decision was unreasonable, arbitrary and capricious, and without a

substantial basis in the record.

     B.     At Each Level of Appeal, Prudential's Justification for Terminating
                Greeley's LTD Benefits Was Arbitrary and Capricious

Prudential's persistent application of incorrect standards to Greeley's claim and

its adoption of different justifications for denying her claim at each level of

administrative appeal demonstrate that its decision to terminate benefits was arbitrary and

capricious.

     1.     Prudential's Initial Termination of Benefits Was Arbitrary and
                Capricious

Prudential's initial decision to terminate benefits because it believed Greeley was capable of returning to her position at Digital was arbitrary and capricious, because it assumed her position was administrative and sedentary. As Prudential later conceded, Greeley's position was not sedentary and she was incapable of returning to work in her former capacity. As demonstrated above in note 12, Prudential's claim that it had determined in February, 1996, that the psychiatric benefit limitation applied was an outright falsehood. For those reasons alone, Prudential's initial denial of benefits was an abuse of discretion.

2.     <u>Prudential's Denial of the First Appeal Was Arbitrary and Capricious</u>

Seeking new justifications to deny Greeley benefits, in response to Greeley's first appeal Prudential asserted for the first time that she was *physically capable* of performing several sedentary occupations. However, Prudential did not determine that Greeley was actually "able to perform" those occupations or that they were occupations for which she was "reasonably fitted by [her] education, training, or experience" as it was required to do under the Policy. For the first time, Prudential also claimed that the psychiatric benefit limitation applied, proclaiming that the "file suggests that [she] <u>may</u> have a psychological condition which is impacting her ability" to work. (Emphasis added). However, under the Policy, the issue is not whether she "may" have a psychological condition "impacting her ability" to work. Rather, the issue is whether her disability was "caused at least in part by a mental, psychoneurotic or personality disorder." Prudential failed to meet that test.

3.     <u>Prudential's Denial of the Second Appeal Was Arbitrary and Capricious</u>

- 21 -

Prudential's denial of Greeley's second was internally inconsistent and based on another incorrect standard. On the one hand, Prudential deemed irrelevant Dr. Green's assessment that Greeley is totally occupationally disabled, claiming she was disabled, but that the disability was caused by a psychiatric condition. However, at the same time, Prudential stated that benefits were not available because she was not disabled. Prudential two-faced position simply cannot stand scrutiny. In any event, Prudential failed to consider whether Greeley was able to perform an occupation "reasonably fitted" to her qualifications, and instead determined she was not disabled because she was able to perform "any occupation."

4.    Prudential's Final Denial Was Arbitrary and Capricious

In its final denial, Prudential sought to fortify its position with yet another inapplicable standard. Specifically, Prudential claimed that there was "there was no evidence of a sickness … that would prevent Ms. Greeley from engaging in any *gainful* occupation." PSUMF ¶132. (Emphasis added). Prudential, yet again, failed to determine whether Greeley "was able to perform" any job "for which [she] was reasonably fitted by [her] education, training, or experience" as it was required to do under the Policy.[20] In any event, Prudential further claimed—incredibly—that, based on Dr. Green's conclusion that Greeley was totally occupationally disabled, Greeley was capable of performing six newly identified jobs. Prudential's self-contradictory reasoning is unsupportable: Greeley could not possibly be capable of performing these jobs if she was totally occupationally disabled.

---

[20] On page 18 of its Memorandum in support of its Motion for Summary Judgment on the Record, the Defendant states that it applied the proper standard. While Prudential may have quoted the policy in its decisions, those decisions clearly show that Prudential applied a different, and incorrect, standard.

C.   Prudential's Determination that Greeley Is Not Entitled to LTD Benefits Is
     Contradicted By the Overwhelming Weight of Evidence in The Record

Both of Prudential's ultimate justifications for terminating Greeley's benefits—

that she was not "totally disabled" and that the psychiatric benefit limitation applied—

were unreasonable and unsupported by the record.

1.   Prudential's Final Determination That Greeley's Disability Was
     Caused By A Psychiatric Condition[21] is Unsupported by the
     Record

The only conclusive and reliable diagnosis of Greeley's condition is Dr.

Yudowitz's opinion that Greeley suffers from a debilitating physical condition known as

fibromyalgia—and not a psychiatric disorder.  Indeed, as is evident from his report, Dr.

Yudowitz's diagnosis is entirely consistent with and supported by the mass of medical

documentation of Greeley's debilitating chronic pain.  Dr. Yudowitz's opinion, more than

that of any other physician in this case, deserved Prudential's consideration, as he is

highly trained, educated and qualified to diagnose chronic pain and pain related to

psychiatric conditions and he conducted a complete pain evaluation and review of

Greeley's medical records.  See Giannone v. Metropolitan Life Ins. Co., 311 F. Supp. 2d

168, 177-178 (D. Mass. 2004) (insurer should have given more weight to claimant's

reliable medical evidence).  Dr. Yudowitz's opinion that Greeley was not suffering from

a psychiatric condition is, indeed, squarely within his expertise.  Whatever weight

Prudential should have given Dr. Yudowitz's report, Prudential's outright dismissal of his

opinion was a complete abuse of its discretion and further evidences its partiality and

bias.  See id.; Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) ("Plan

---

[21] "[I]t is a general rule of insurance law that the insurer bears the burden of showing that a covered injury
falls within an exclusion provision."  Cleary v. Knapp Shoes, 924 F. Supp. 309, 315 (D. Mass. 1996) (and
cases cited).  The burden was on Prudential to demonstrate that the psychiatric benefit limitation applied.
Id.  at 315-17.

administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence").[22]

In contrast to Dr. Yudowitz, each of Prudential's evaluating physicians was unable to explain the cause of Greeley's symptoms,[23] and equivocated as to whether they were psychiatric in origin. Neither Dr. Donelson nor Dr. Pick conducted a psychological examination and Dr. Smith was unable to offer an opinion. Moreover, to whatever extent Drs. Pick and Donelson report that Greeley's condition was psychiatric or that she was not disabled, the previously concealed documents reveal that Prudential was guiding their written opinions.

While Dr. Lipsitt's report lists a somatic disorder as his diagnosis, even the most cursory review of that report demonstrates that he was unsure of Greeley's condition. There is simply no evidence that, when Greeley was diagnosed with and operated upon for TMJ in 1988 and 1989, her disability was caused by some psychological stressor. As Dr. Yudowitz points out, any psychological condition from which Greeley is suffering is not the cause of her disability; it is a common secondary effect of fibroyalgia. See Giannone, 311 F. Supp. 2d at 177, n.6 (recognizing that fibromyalgia may cause secondary psychological effects). In any event, Prudential's internal documents reveal that, in fact, Dr. Lipsitt believed Greeley "definitely has a chronic pain syndrome" and that he was unsure whether the pain was psychiatric or physiological in origin. See McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 170-171 (6th Cir. 2003)

---

[22] It is of significance that Prudential took no step to have Greeley evaluated for fibromyalgia in light of Dr. Yudowitz's report.

[23] Indeed, the inability of either Dr. Pick or Donelson to diagnose an orthopedic condition makes perfect sense, as the Seventh Circuit has noted, because fibromyalgia is *not* an orthopedic condition. See *supra*, note 3. At the same time, each of their reports chronicle symptoms which fit a diagnosis of fibromyalgia. See id.

(unreasonable for insurer to rely on doctor's diagnosis which was originally equivocal and "became more definite . . . only after he was contacted by [the insurer]").

Without support from the examining physicians that Greeley's condition is psychiatric, Prudential unreasonably relied instead on the patently biased and unsupportable opinion of Dr. Brachman.  See Gannon, 360 F.3d at 214 (insurer's reliance on medical report must be reasonable); Conrad, 292 F. Supp. 2d at 238 (insurer's reliance on biased review of medical records unreasonable).

Dr. Brachman's report does not survive even the slightest scrutiny.  First, Dr. Brachman was not provided with the very medical records upon which Prudential originally determined Greeley was disabled.  Second, even the most cursory comparison of her report to the materials upon which it is based reveals that it is unmistakably and patently biased.  Conrad, 292 F. Supp. 2d at 238 (denial of benefits unreasonable where insurer relies on a biased review of medical records by insurer's medical examiner).  Dr. Brachman's consistent pattern of misrepresenting evidence to support Prudential's position, selectively highlighting a few sparse notations in the records that are arguably adverse to Greeley's claim, and consciously ignoring the overwhelming weight of evidence documenting Greeley's debilitating pain reveals a palpable prejudice against Greeley.  Each of Dr. Brachman's primary contentions—that Greeley is not disabled and that her condition is psychiatric—is simply not warranted from a fair and objective review of the record in this case.

In short, Dr. Brachman's report is so lacking in credibility, unreliable and patently biased that it should have been given no weight at all by Prudential.[24]  Conrad, 292 F.

---

[24] While an insurer need not give special weight to a claimant's evidence over its own, Gannon, 360 F.3d at 216, it may not arbitrarily disregard the claimant's reliable medical evidence,  Black & Decker, 538 U.S. at

Supp. 2d at 238; Barnes v. Bellsouth Corp., 2003 U.S. Dist. LEXIS 18766 (D.N.C. 2003)

("The Defendants abused their discretion by arranging for and relying on a report that

was so obviously biased").  In light of Greeley's documented thirteen year history of

debilitating chronic pain and Dr. Yudowitz's objective diagnosis of fibromyalgia,

Prudential abused its discretion in relying on Dr. Brachman's report which was not based

on an examination of Greeley and was contradicted and unsupported by the

overwhelming weight of the evidence.  Giannone, 311 F. Supp. 2d at 178 (insurer abused

its discretion in relying on speculative medical opinions that claimant's condition was

psychiatric where the medical records indicated the claimant had fibromyalgia).  See also,

Cook, 320 F.3d at 21 (acknowledging that it is difficult, if not impossible, for a claimant

to provide "clinical objective evidence" of fibromyalgia and chronic fatigue syndrome

because of the nature of the disease).

> 2.    Prudential's Determination That Greeley Was Not 'Totally
>        Disabled' Is Unsupported by the Record

Even with Dr. Yudowitz's report and more than ten years of medical records

documenting Greeley's disabling chronic pain, Prudential took the untenable position in

denying Greeley's final administrative appeal that there was *"no evidence* of a sickness"

rendering Greeley "not able to perform, for wage or profit, the material and substantial

duties of any job for which [she was] reasonably fitted by [her] education, training, or

experience."  Not one medical practitioner—neither Prudential's nor Greeley's—ever

cast doubt on the existence of Greeley's symptoms; even Prudential's doctors

---

834, and rely instead on a palpably biased report. Conrad, 292 F. Supp. 2d at 238.  In addition, "reason
dictates that the assessment of an impartial physician who has actually examined a particular patient is
likely to be more reliable than the assessment of an equally impartial physician who has only reviewed the
paper file" Black v. Unum Life Ins. Co. of Am., 324 F. Supp. 2d 206, 216 (D. Me. 2004).

acknowledged her debilitating symptoms and that she was, in fact, disabled.  For example

Dr. Donelson indicated that he "[did] believe . . . she is experiencing these symptoms"

and that she is "truly disabled", and Dr. Lipsitt told Prudential that Greeley "definitely

has a chronic pain syndrome."  While some of Prudential's doctors may have questioned

the underlying cause of Greeley's disability, there is simply no support in the record for

Prudential's conclusion that she was not disabled.  See Boardman v. Prudential Ins. Co.

of Am., 337 F.3d 9, 17 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome

and fibromyalgia may not lend themselves to objective clinical findings, the physical

limitations imposed by the symptoms of such illnesses do lend themselves to objective

analysis"); Brigham v. Sun Life of Can., 317 F.3d 72, 84 (1st Cir. 2003) ("We fully

recognize that laboratory tests or similar diagnostic procedures will not always be

necessary to substantiate a claim of disability, as certain disabling conditions are not

susceptible to such objective evaluations"); Cook, 326 F.3d at 919 (improper for insurer

to rely on doctor who erroneously concluded that because the claimant's reported

fibromyalgia symptoms were entirely subjective, the claimant was not disabled); Colby v.

UnumProvident, 328 F. Supp. 2d 186, 191 (D. Mass. 2004) (Tauro, J.) (insurer "must

consider ... restrictions and limitations even if they were not supported by objective

medical evidence").[25]

    To the contrary, the history of the claim actually demonstrates that Prudential had

consistently acknowledged Greeley's disability—whatever its actual cause; Prudential

originally approved her claim in 1989 and continued to pay benefits until 2000 based on

the same disabling chronic pain that continues to hinder Greeley to this day.  See Colby,

---

[25] Moreover, Prudential's persistent reliance on the absence of a documented *orthopedic* or diagnosed *physical* condition relies on an improper definition of "sickness" under the policy.  The policy defines sickness as "any disorder of the body or mind"—not just orthopedic or musculoskeletal conditions.

328 F. Supp. 2d at 191 (insurer's decision arbitrary and capricious where insurer initially considered claimant's condition debilitating and there was no evidence that claimant had recovered sufficiently to return to work).  Moreover, Prudential's surveillance demonstrates nothing as to Greeley's ability to return to work.  If anything, it shows that Greeley's activities were entirely consistent with the modest lifestyle her treating practitioners advised her to adopt.  Contra, Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 31 (1st Cir. 2001) ("damning" surveillance video revealed claimant capable of strenuous physical activity and undermined claimant's medical evidence).  Prudential's claim that the surveillance indicates she leads an "active lifestyle" is simply belied by even a cursory glance at the surveillance reports and the surveillance videotape.[26]

Moreover, the vocational assessments in the record demonstrate that Prudential's position is inconsistent with the Policy.  Prudential concluded Greeley was not totally disabled because she may have been physically capable of performing a sedentary job.  This hypothesis is incorrect for two reasons.  First, the standard under the Policy is whether she is "able to perform any job for which [she was] reasonably fitted by [her] education, training, or experience."  Thus, whether she can perform a sedentary job is irrelevant, unless that job is "reasonably fitted" to her qualifications.  Second, the question under the Policy is not whether she is *physically* capable of performing a suitable job, but merely whether she "is able to perform" such a job.  The overwhelming evidence in the record clearly demonstrates that because of her debilitating chronic pain, Greeley was unable to perform any job reasonably suited to her.

---

[26] Greeley urges the Court to review the videotape.

3.   Prudential's Justifications For Terminating Benefits Are Inherently Contradictory

Prudential's simultaneous determinations that the psychiatric benefit limitation applied and that Greeley was not disabled are inherently contradictory. On the one hand, Prudential claimed that Greeley had a disability but that the disability was caused by a psychiatric condition. On the other hand, Prudential determined that Greeley did not have a disability. For Prudential's denial stand, Greeley must either have been disabled because of a psychiatric disorder or not disabled at all.

II.   Count II: Prudential Withheld Relevant and Pertinent Materials from Greeley, Denying Her A Full and Fair Opportunity to Appeal

From the outset of the appeal process, Prudential withheld materials from Greeley, denying her a full and fair opportunity to challenge Prudential's decision to terminate her benefits. See 29 U.S.C. § 1133 (insurer must provide a reasonable opportunity for "full and fair review" of termination of benefits); 29 C.F.R. § 2560.503-1(g)(1)(ii)(2000)(insurer must allow claimant to review all "pertinent documents"); 29 C.F.R. §§ 2650.502-1(h)(2)(iii) & (m)(8) (2002) (as of January 1, 2002, insurer must provide all materials "submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination").

At each level of appeal, Prudential cited new materials that were never made available to Greeley. Specifically, in denying two separate appeals, Prudential listed a host of positions it claimed Greeley was capable of performing. Yet, Prudential never provided Greeley with any documentation regarding those positions. Under both the old and new regulations of the Department of Labor, this failure violated Greeley's right to

receive all "pertinent" and "relevant" materials. 29 C.F.R. § 2560.503-1(g)(1)(ii)(2000); 29 C.F.R. §§ 2650.502-1(h)(2)(iii) & (m)(8) (2002). Greeley could not possibly have effectively appealed these aspects of Prudential's administrative determinations, because she did not have access to the vocational assessments upon which they were based.[27] Similarly, it was, and remains to this day, impossible for Greeley to assess and/or challenge the opinions of Prudential's "clinical team and medical director" identified in Prudential's denial of Greeley's first appeal, because Prudential never produced the underlying documents.[28] Likewise, Greeley was never given an opportunity to examine the opinion of the "consulting physician" identified in Prudential's final denial, although now Prudential produces that report in support of its argument to the Court. Prudential's withholding of materials upon which it admittedly relied undermined Greeley's right to effectively appeal it's decisions.

Moreover, as is evident from Prudential's proposed administrative record, Prudential withheld a substantial amount of additional material from Greeley. Among these documents are records indicating that Prudential actively instructed its "independent" physicians what to include in their reports despite evidence that those physicians actually believed Greeley was disabled. Moreover, the SOAP notes provide

---

[27] For example, Greeley was completely unable to assess either the geographic or vocational viability of these positions. See Digregorio, 2004 U.S. Dist. LEXIS 15485, at *55, n.24 . Prudential provided no information about these jobs other than their title and hourly pay range. Moreover, it was completely unreasonable for Prudential to suggest in its first denial that a senior, sophisticated, successful, Manufacturing Manager with decades of experience could be relegated to, for example, the position of Director of Records Management at this stage of her career. While Greeley knew nothing about the job description or requirements of this position, so it was impossible to know whether her education, training and experience would enable her to do the job, it is clear that any of the four positions to which Prudential referred would be levels below what Ms. Greeley's education, experience and training suggest would be an appropriate job for her.

[28] Prudential's recent disclosures demonstrate that its Medical Director, Marcia Scott, had been intimately involved since 1996 in orchestrating Prudential's improper campaign to obtain biased medical reports from Prudential's physicians in order to build a convincing case on paper to terminate Greeley's LTD benefits.

insight into Prudential's faulty reasoning.[29] Certainly, as it is now, much of the omitted information would have been central to Greeley's appeals. Prudential apparently now concedes the relevance of the withheld documents and that it relied upon them in terminating Greeley's benefits. In its Memorandum of Law, Prudential states:

> Plaintiff may argue that the Record should be comprised of a limited number of documents which are already contained within the Defendant's Record. However, ignoring the evidence which Prudential reviewed and/or relied on in making its decision would be contrary to the purposes of judicial review... This Court should review the record as it stood before Prudential, not some abbreviated version supplied by the Plaintiff's attorneys.

Plainitff's Memorandum of Law, pp. 17-18 (emphasis added). Prudential proves Greeley's point: Plaintiff's "abbreviated version" of the record consists of the entire set of documents Prudential provided to Greeley during the administrative appeal—the same set of documents that Prudential told Greeley "included *all documents and information* on which our decision to deny benefits was based." PSUMF ¶ . Prudential now admits that it misled Greeley.

In any event, as of January 1, 2002, the Department of Labor's regulations required Prudential to produce all documents in Greeley's file, regardless of whether it relied upon them in making its decision. As this Court stated in DiGregorio, "under the current regulations, a claimant ... would be entitled to much, if not all, of her claim file." 2004 U.S. Dist. LEXIS 15485, at *62, n.26. Prudential's failure to provide the entire claim file to Greeley (at least after January 1, 2002) amounts to a clear breach of its obligations under the applicable regulations. Id.

---

[29] See DiGregorio v. Pricewaterhousecoopers Long Term Disability Plan, 2004 U.S. Dist. LEXIS 15485, *11-*14 (D. Mass. 2004) (Woodlock, J.) (examining insurer's internal claims notes).

Finally, the record strongly suggests that Prudential continues to withhold additional material, including the second surveillance videotape. See Raithaus v. Unum Life Ins. Co., 335 F. Supp. 2d 1098, 1118 (D. Haw. 2004) ("Plaintiff's inability to submit a response to the [surveillance] video during the administrative process means that [the insurer] did not conduct a 'full and fair review' of the administrative record"). Similarly, the record reveals that there may indeed be additional documents to which Greeley has never been given access, such as records reflecting correspondence with Drs. Lipsitt, Smith and Brachman.

Prudential's failures to provide all "pertinent" and "relevant" documents" violate the above-cited regulations and undermined Greeley's right to a "full and fair review" of her claim. See Ellis v Met. Life Ins. Co., 126 F.3d 228, 237 (4th Cir. 1997) ("The opportunity to review the pertinent documents is critical to a full and fair review, for by that mechanism the claimant has access to the evidence upon which the decision-maker relied in denying the claim and thus the opportunity to challenge its accuracy and reliability."); Palmer v. Univ. Med. Group, 994 F. Supp. 1221, 1241 (D. Or. 1998) (same). Therefore, Prudential's ultimate determination was procedurally defective and should be reversed. See Teen Help v. Operating Eng'rs Health & Welfare Trust Fund, 1999 U.S. Dist. LEXIS 21989 (D. Cal. 1999); Tavares v. Unum Corp., 17 F. Supp. 2d. 69, 79 (D.R.I. 1998) (insurer's decision made in violation of 29 U.S.C. 1133 is "legally invalid and [does] not effect a termination of benefits"). At a minimum, the documents which Prudential would now like the Court to consider, but which were hidden from Greeley during her appeals, should be stricken from the

administrative record. 29 U.S.C. § 1132(c) ("the court may in its discretion order

such … relief as it deems proper"). In addition, Greeley is entitled to monetary

damages up to $100 per day under 29 U.S.C. § 1132(c).

## CONCLUSION

For the foregoing reasons, Plaintiff Dawn M. Greeley submits that her Motion for

Judgment on the Administrative Record on both Counts (I & II) of Plaintiff's Complaint

should be ALLOWED. Accordingly, Greeley respectfully requests that this Court:

1.  Order, adjudge and decree that the Plaintiff is totally disabled, under the terms of the Policy, and that Defendant is obligated to pay to Plaintiff all amounts due her pursuant to the provisions of the Policy;

2.  Reverse the Defendant's decision to terminate the Plaintiff's Long Term Disability benefits and Order the Defendant to pay to Plaintiff retroactive benefits due under the Policy from the date the Defendant ceased paying those benefits, plus prejudgment interest. Cook v. Liberty Life Assurance Co., 320 F.3d 11, 24 (1st Cir. 2003) ("Retroactive reinstatement of benefits is appropriate in ERISA cases where, as here, but for [the insurer's] arbitrary and capricious conduct, [the insured] would have continued to receive the benefits or where there [was] no evidence in the record to support a termination or denial of benefits"); Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 223 (1st Cir. 1996) (prejudgment interest available in ERISA cases);

3.  Order, adjudge and decree that the Defendant is obligated to forthwith pay to Plaintiff $100 per day, or such other amount as determined by the Court, for each and every day that demanded disclosure was delayed beyond the thirty day period beginning January 21, 2001, as allowed by Section 502(c)(1) of ERISA, 29 U.S.C. § 1132(c)(1) et seq;

4.  Order, adjudge and decree an award to the Plaintiff of the costs of this action and reasonable attorney's fees and expenses, as allowed by Section 502(g) of ERISA, 29 U.S.C. § 1132(g);

5.  Should the Court determine that the Defendant's decision on Greeley's final administrative appeal was proper (i.e., that it's early administrative findings were arbitrary and capricious but that it's final determination was not), Order that the Defendant pay to the Plaintiff retroactive LTD benefits plus prejudgment interest from the date it ceased paying those benefits

through the date that the Defendant first produced documentation to Greeley or this Court sufficient to sustain its position;

6.   Order, adjudge and decree such other and further relief as this Court deems just and proper.

Respectfully Submitted,

DAWN M. GREELEY

By her Attorneys,

PRINCE, LOBEL, GLOVSKY & TYE LLP

By:  /s/ Richard D. Glovsky
Richard D. Glovsky (BBO#: 195820)
Jeffrey A. Dretler (BBO#: 558953)
Joshua A. Lewin (BBO#: 658299)
585 Commercial Street
Boston, MA  02109
(617) 456-8000