UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAWN M. GREELEY,

Plaintiff,

v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

Defendant

CIVIL ACTION NO.

04-10772 DPW

## PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE RECORD AND PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56.1, Plaintiff, Dawn M. Greeley ("Greeley"), submits the following statement of material facts in support of her Motion for Summary Judgment on The Administrative Record and in opposition to the Defendant's Motion for Summary Judgment on The Record. The following material facts are derived from "Plaintiff's Proposed Administrative Record" filed with the Court on August 11, 2004. All citations to that record will include a reference to the page number(s) bate stamped in the format "PL___." Facts derived from additional documents produced by the Defendant will be cited in the format DG___."

## MATERIAL FACTS

**Greeley Becomes Manufacturing Strategic Resources Manager at Digital**

1.  Plaintiff, Dawn M. Greeley ("Greeley"), attended Simmons College, where she
    earned an honors Bachelor's of Science Degree in economics and political
    science.  PL293, ¶3.

2.  Ms. Greeley began working at Digital Equipment Corporation ("Digital") in 1971
    as a "Sales Analyst."  PL293, ¶4.  Over the course of the next sixteen years,
    Greeley held various high-level positions with Digital; in 1987, she was promoted
    to a senior level position as "Manufacturing Strategic Resources Manager" at
    Digital's Manufacturing Headquarters.  PL293, ¶¶4-7.

3.  Greeley's professional training consisted of an extensive number of professional
    training seminars relating to high technology, manufacturing management and
    personnel development.  PL293, ¶3.

4.  When she became Manufacturing Strategic Resources Manager, Digital was an
    international high technology company with more than 120,000 employees
    throughout the United States, Canada, Puerto Rico and Taiwan; it generated $12
    billion in revenue.  PL294, ¶8; PL301, ¶6.

5.  Digital's job description for Greeley's position as a Manufacturing Strategic
    Resources Manager stated: "Manages and directs . . . multiple manufacturing
    facilities," and is responsible for "production, operations and control, materials
    management, quality control and manufacturing engineering."  PL296.

6.  The job description also stated that the individual in Greeley's position "typically
    oversees multiple locations," has "[c]ontacts inside and outside Digital [which]

typically involve senior individuals," and that she may manage between 50 and 200 employees "or more." PL297.

7.    Greeley's position at Digital called for her to solve "very complex technical issues across multiple disciplines" and "unique" problems. PL298. It required a "mastery to state-of-the-art technical, functional, or business knowledge"; and "in depth knowledge in a specialized area." PL298.

8.    The job description further described her responsibilities to include, *inter alia*, organizing staff and developing personnel resources, interacting with customers and representing the company. PL296. She was responsible for ensuring that the manufacturing facility operations conformed to federal, state and local regulations. PL296.

9.    As Manufacturing Strategic Resources Manager, Greeley was responsible for revenues of $75-$100 million, expenses of $10-$20 million, and assets of $25-$75 million; and had an "indirect opportunity to affect $500 million or more." PL297.

10.   As Manufacturing Strategic Resources Manager, Greeley worked between fifty and seventy hours per week. PL294. She traveled frequently, both domestically and internationally, and was required to interact with various customers and employees, move about the plant floors, and attend meetings. She was constantly "on the go." PL294; PL301, ¶¶ 6-8.

11.   While Greeley's position entailed some administrative tasks, it was neither a sedentary position nor a desk job. PL299, ¶ 8; PL301, ¶ 8; PL294, ¶9.

**The Disability Policy**

12.   When terminating Greeley's benefits, Prudential represented that in order to

receive benefits, a claimant must "meet all contractual requirements including the

following definition of 'Disability:'

'Total Disability' exists when Prudential determines that all of these
conditions are met:

   "(1)   Due to sickness, or accidental injury, both of these are true:

      (a)   You are not able to perform, for wage or profit, the
            material and substantial duties of your occupation.

      (b)   After the Initial Duration of a period of Total
            Disability, you are not able to perform, for wage or
            profit, the material and substantial duties of any job
            for which you are reasonably fitted by your
            education, training, or experience.   The initial
            duration is equal to the first 24 months of Inbenefit.

                              * * *

      In addition, if your Disability, as determined by Prudential, is
      caused at least in part by a mental, psychoneurotic or personality
      disorder, benefits are not payable for your Disability for more than
      24 months."

PL007-008.

13.   Before filing this lawsuit, Greeley was never provided by Prudential with a copy

of the policy.  See PL006-250.

**Greeley's Medical Problems & Initial Treatment**

14.   In the fall of 1987, Greeley began to suffer debilitating pain in her jaw.  PL294,

¶11.

15.   Dr. Mark A. Piper examined Greeley on November 10-11, 1987.  PL303-305.  Dr.

Piper took a "detailed history," chronicling Greeley's "constant" "aching"

temporalis pain that extended to her jaw and neck.  After various examinations

and tests, Dr. Piper reported, *inter alia*, x-rays showing "rotatory and translatory

manipulation pain," "extremely limited movement of . . . mandibulor condyles,"

and "degenerative arthritic changes."  Hospitalization testing revealed

"considerable irregularity of both joint spaces"; a "scarred and non-pliable

meniscus"; and that the "left temporomandibular joint meniscus was completely

subluxed."   He opined that "arthritic changes would be expected to be

progressive" and recommended a surgical resolution. PL304.

16.     Greeley underwent TMJ surgery at Massachusetts General Hospital in 1988. The

surgery did not relieve her pain.  PL294, ¶¶ 11-13.  The facial pain team

providing her care told her there was no further medical treatment available to

reduce the pain, and referred her to the Boston Pain Center.  PL192; PL294, ¶¶

11-13.

17.     The staff at the Boston Pain Center advised Greeley that the pain would never

cease, and that she needed to modify her lifestyle to minimize and distract her

from the pain. PL294, ¶¶ 11-13.  They instructed her to continue on an exercise

and meditation regimen, as well as to engage in creative activities. Id.  In

response, Greeley began painting and garden design.  Id.

**Greeley's LTD Claim**

18.     On August 16, 1989, Greeley filed a claim for disability benefits. PL196-197.

The attending physician's statement of disability, completed by Dr. Donoff, M.D.,

D.M.D., notes a diagnosis of "chronic facial pain." PL192.  Greeley had

consulted "more than a dozen other doctors" for her condition. PL196.

19.  On October 7, 1989, Prudential approved her claim and began paying benefits under the policy.

**Prudential Tries To Build a Case to Terminate Greeley's Benefits in 1995**

20.  In 1995, Prudential conducted a review of Greeley's claim. Prudential solicited letters and medical records from Greeley's treating practitioners, including her chiropractic physician, Thomas C. Michaud, D.C. (PL189), her physical therapist, Lisa Gross, P.T. (PL190), her osteopath, James Gronemeyer, D.O. (PL172), and her alternative health care administrator, Matilde Flores, Lic. A.C. (PL189).

21.  Dr. Michaud stated that he saw Greeley weekly, that she complained of "chronic upper cervical and trapezius pain" that was "most likely related to a pain cycle between her suboccipital muscles and TMJ" for which she underwent surgery in 1988.  PL198.

22.  Lisa Gross, Greeley's physical therapist, stated that she treated Greeley once per week, focusing on "relieving the severe muscle tension that exists in the craniomandibular, craniovertebral, cervical spine and thoracic spine regions." PL190.  She noted that Greeley's condition "continues to cause significant limitation in daily functional activities."  In addition, she related that Greeley was on a home daily exercise program to help alleviate symptoms, but that "progression with strength exercises must be very slow" "[b]ecause of the high sensitivity and irritability of myofascial trigger points."  PL190.  She concluded that Greeley "is not ready to return to work at this time."  PL190.

23.  The physical therapy records describe weekly objective physical examinations of Greeley by Ms. Gross, making repeated reference to Mrs. Greeley's sensitive "trigger points." PL235, 237, 238, 239, 242, 245, 249, 250.

24.  The medical records submitted by James Gronemeyer, D.O., describe detailed physical examinations of Greeley for low-back pain from March through June, 1995.  Included in those records are notations of "atypical face pain." PL172, 173, 174, 175.

25.  Matilde Flores stated that she treated Greeley every 4 to 8 weeks, including acupuncture, massage, herbal therapy, heat therapy and electric stimulation.  She noted that Greeley "is in severe chronic pain which affects her ability to concentrate and her capacity to deal with daily life activities" and that treatments gave her only "temporary relief."  She concluded that Greeley could not "perform the kind of stressful, high level performance job she used to have." PL198.

26.  Matilde Flores' office notes from Greeley's visits to Gateway Healthcare Associates date back to 1991. PL199-234.  Ms. Flores observed in 1991 that Greeley could barely open her mouth (PL199), that her pain could be relieved for only a few hours (PL200), and that her "whole back [was] affected by tremendous tension in head, neck [and] shoulders" (PL199).  The records document chronic head, neck and back pain, migraine headaches, and a constant (although varying in degree) inability to sleep because of the pain. PL199-234.  By 1993, Flores reported that the pain had "distributed more down to shoulders...back, shoulder blade, hip [sic]." PL221.  In 1994, Flores noted that "due to the fact that her level

of pain is very high, anything that distresses her will aggravate her physical condition making her pain intolerable." PL230.

**Prudential Conducts an 'Independent' Medical Examination**

27.    On June 13, 1995, Prudential arranged for Greeley to be examined by two orthopedic surgeons—Robert Pick, M.D., M.P.H. and Ronald Donelson, M.D. PL179-188.  The examination was apparently conducted by both doctors together. See PL179.

28.    Dr. Donelson reported "pain rather diffusely about [Greeley's] occipital and bilateral temporal areas and into the TMJ regions as well as diffuse neck pain radiating out towards both shoulders." PL187.   He also reported "moderate loss of full cervical flexion, limited by her symptoms" and that full cervical extension was limited by posterior cervical and occipital head pain." He also noted that she was unable to fully open her mouth.  PL187.

29.    Dr. Donelson concluded that he "[did] believe . . . that she is experiencing these symptoms"  (PL187) and that she is "truly disabled." PL 188.

30.    However, based on the limited exam, Dr. Donelson was unable to identify an orthopedic cause of her symptoms. PL187-188.

31.    Dr. Donelson noted that Greeley had only been evaluated psychologically once (six years prior).  He did not perform any psychological testing or make a psychiatric diagnosis.  Despite this, he hypothesized that Greeley may have had "significant non-organic/behavioral issues that are dominating her perception of symptoms and disability. . . I believe she has significant underlying anger and

depression, some of which may have well pre-existed her presenting symptoms…"  PL188.

32.   Dr. Pick was also unable to orthopedically diagnose Greeley.  He did not even "address the issue of the described temporomandibular joint symptamology"—the very condition for which Greeley received disability benefits. He stated that he "was unable to establish or substantiate" an *orthopedic* condition that would keep Greeley from working as a manufacturing manager.  PL179-182.  There is no evidence that Dr. Pick knew what the job of "manufacturing manager" entailed.

33.   Dr. Pick, like Dr. Donelson, did not opine that Greeley's symptoms were not real or that she was malingering.  See PL179-182.

34.   Prudential asked to G. Richard Smith, M.D., to provide an opinion whether Greeley's condition was psychological in nature.  See PL169.  Prudential has never provided a copy of that request to Greeley.

35.   On September 21, 1995, Dr. Smith issued a report in response to Prudential's inquiry as to "whether a psychiatric disorder was present."  PL169-170.

36.   Dr. Smith did not examine Greeley.   PL169-170.  He reviewed her medical records, including the reports from Dr. Pick and Dr. Donelson.  His report notes that "[t]he findings from Ms. Flores, Ms. Gross and Mr. Minchaud [sic] all support chronic pain symptoms and report her to have substantial function limitations related to this pain."  He also noted that Drs. Pick and Donelson found "no evidence of pain secondary to cervical spine disease or temporo-mindibular joint disease."  Id.

37.    Dr. Smith's report states that "[b]oth Drs. Donelson and Pick suggest that significant behavioral or psychiatric issues may be present. One postulates that they suspect underlying anger and depression as well as situational factors which may perpetuate her functional limitations." PL 169. Dr. Pick's report, however, makes no mention of a psychological condition being present. See PL179-182.

38.    Dr. Smith concluded that "in all probability" "there was a psychiatric disorder present" even though "from simply reviewing the records I cannot tell you which disorder." Unable to diagnose Greeley's condition, Dr. Smith recommended a psychiatric evaluation. PL169-170.

39.    On November 8, 1995, a Vocational Assessment of Greeley was performed by Donna Maher-Nealon. PL165-168. The assessment merely recounts a telephone conversation between Greeley and Ms. Maher-Nealon, during which Greeley described her daily regimen designed to cope with her pain, her frustration with Prudential for not assisting her, her frustration in not having an official diagnosis of her pain, and her belief that she has an undiagnosed neuromuscular disease. The assessment recounts the evaluation by Dr. Smith and recommends that she be evaluated psychiatrically. PL165-168.

40.    On February 8, 1996, Don R. Lipsitt, M.D., performed a two hour psychiatric evaluation of Greeley at Prudential's request. PL162-164.

41.    Dr. Lipsitt's report states that he "had been told in advance that Greeley had a long history of chronic somatic complaints." PL162. Prudential made that claim to Dr. Lipsitt despite the fact that not one practitioner had ever diagnosed Greeley's condition as somatic.

42.     Prudential never provided to Greeley any document that reflects what was told to Dr. Lipsitt in advance about Greeley.

43.     Dr. Lipsitt reviewed the reports of Drs. Pick, Smith, and Donelson before his evaluation. Dr. Lipsitt noted that Greeley believed Prudential was putting her through repeated evaluations to try and establish that her condition was psychiatric so that they could discontinue benefits. He noted that her responses seemed rehearsed "which is not unusual for one who has had repeated evaluations, but does not allow of spontaneous responses that offer insight into possible psychological understanding of somatized conditions." PL162.

44.     Dr. Lipsitt concluded that "[i]t is very difficult to make a positive assessment of this patient psychiatrically…" He added that additional information would be helpful in making a positive assessment. PL162-164.

45.     The most that Dr. Lipsitt was able to conclude was that Greeley's personality "is consistent" with that of somatizers. Despite being unable to make a positive assessment, he listed "Somatoform Pain Disorder or Somatoform Disorder NOS" as his diagnosis. PL163-164.

**Undeterred by the inconclusive medical opinions, Prudential Seeks Other Evidence Upon Which to Terminate Greeley's Benefits**

46.     Undeterred by the inconclusive medical opinions it had solicited, Prudential hired an investigator to conduct surveillance of Greeley in November, 1997. PL142-150.

47.     The surveillance report indicates that investigators learned Greeley's occupation was listed as an artist and that she was involved in watercolors "as a hobby." During the course of the surveillance, Greeley only departed her residence once

for approximately one hour.  She was observed driving her car home from a gas station.  PL142-150.

48.     The surveillance report indicates that video surveillance was performed.  Id. Prudential has never provided Greeley with a copy of a video from this surveillance.

49.     The investigator conducted surveillance again in December of 1997.  PL121-128. The surveillance report indicates that Greeley did not leave her residence on December 2, 1997.  PL122-123.  On December 3, 1997, the investigators saw Greeley go to a store with a female companion.  The companion carried a bag out of the store, while Greeley proceeded empty-handed.  PL124.

50.     In two days of surveillance, Greeley was away from her residence for not more than two hours and twenty minutes.  PL123-127.

51.     The investigators also saw three of Greeley's paintings for sale at an art exhibit. None of the gallery employees had ever heard of Greeley.  PL126-127

**Prudential Seeks Additional Information**

52.     On January 29, 1998, Prudential wrote to Greeley notifying her that it was reviewing her Long Term Disability Claim.  PL103-104.  Prudential stated that it was evaluating her claim to determine whether she was still eligible for benefits under section 1(b) of the policy and whether the psychiatric benefit limitation applied.  PL103-104.

53.     On February 28, 1998, Matilde Flores responded to Prudential's request for an update on Greeley's condition.  She reported that she had seen Greeley every six to eight weeks, treating her with acupuncture, moxibustion, electric stimulation

and muscular therapy. She noted that therapies had helped Greeley to "manage the level of her chronic pain" and that she would need ongoing treatment. PL099.

54. Dr. Nancy Berger, Greeley's chiropractor, submitted Greeley's medical records documenting treatment and evaluations from 1996 throughout 2000. PL 035-059; 061-074.

55. On September 8, 2000, Jan Powers LaGuardia, R.P.T., Greeley's physical therapist, submitted a letter to Prudential, describing Greeley's condition and treatment. PL027.

56. Ms. LaGuardia stated that "Greeley has been receiving physical therapy one time per week for treatment of fibromyalgia." PL027.

57. She noted that Greeley's treatment for breast cancer "significantly affected her fibromyalgia causing setbacks in her progress." (Greeley was treated for breast cancer in 1997. PL028-029) She also described various "soft tissue restrictions" and "joint instability." PL027.

58. Physical therapy records from Ms. LaGuardia document several objective evaluations of Greeley, including notations of Greeley's sensitive "trigger points." PL091-098.

59. Prudential once again hired an investigator to conduct surveillance of Greeley. PL020-026.

60. This time, the surveillance report indicated that on August 15, 2000, Greeley was away from her residence for seven hours. The report does not detail Greeley's activities during that time. On August 16, 2000, the investigators observed

Greeley and her husband sailing in a "small sunfish-type boat." The investigator videotaped his observations. PL020-026.

61. The videotape shows the couple meandering in the harbor. Greeley remains seated the entire time, as her husband maneuvers the sail and rudder. PL292.

62. Prudential also learned that Greeley was one of forty-eight members of the Executive Committee Chilmark Town Affairs Counsel. PL149-150.

**Prudential Conducts an "Independent" Medical Review**

63. On December 5, 2000, Prudential wrote to Greeley to explain that they were performing an "Independent Medical Review" of "all of your current medical records from the offices of Matilde Flores, Jan Powers LaGuardia, Dana Farber Cancer Institute, and Dr. Nancy Berger." PL17-18.

64. On December 16, 2000, Dr. Gwen O. Brachman submitted to Prudential her review of Greeley's medical records. PL014-015.

65. Dr. Brachman was not provided any medical records dated prior to 1991, including those related to the original diagnosis of "chronic facial pain" and the TMJ surgery. PL014.

66. Dr. Brachman's report characterizes Greeley's position as a Manufacturing Manager at Digital as "sedentary." PL014-015. Prudential has never provided Greeley with documents relating the basis upon which Dr. Brachman made this determination.

67. Dr. Brachman's report summarizes the medical records submitted by Matilde Flores, stating that there are "no physical exams" other than one mention of back spasms. Dr. Brachman then selectively quotes several notations found in the

records indicating physical improvements by Greeley.  She concludes that "[t]here is no indication . . . Ms. Greeley is physically unable to perform the essential functions of the job." PL014.

68.  Next, Dr. Brachman's report summarizes treatment by Lisa Gross, Greeley's physical therapist between 1994 and 1995.  Dr. Brachman's report states that "although Ms. Gross makes reference to trigger points, there are no real physical examinations or functional assessments in the" records.  PL014.  Dr. Brachman made this statement despite the fact that the medical records are replete with references to physical examinations of Greeley by Ms. Gross.  PL235-237; 240-243; 245-250.  The report selectively quotes several notations found in the records indicating improvements in her symptoms as well as an ability to conduct certain limited physical activity.  PL015.

69.  Dr. Brachman's report summarizes Dr. Michaud's letter as merely "describing Ms. Greeley's symptoms and treatments" despite the fact that Dr. Michaud stated in his letter that her pain was "most likely related to a pain cycle between her suboccipital muscles and TMJ." PL015.

70.  Dr. Brachman summarizes the IMEs conducted by Drs. Pick, Donelson, and Lipsitt.  The report selectively emphasizes the psychiatric related comments by Drs. Donelson and Lipsitt and omits various comments in those reports that, *inter alia*, it was difficult to make a positive psychiatric assessment of Mr. Greeley and that she was "truly disabled." PL015.  She stated that Greeley had an underlying psychiatric disorder causing her pain symptoms.  PL016.

71.    Dr. Brachman's report summarizes physical therapy records from Jan LaGuardia. She states that "there are no functional assessments documented." The report acknowledges, however, that Ms. LaGuardia was treating Greeley for fibromyalgia.

72.    Dr. Brachman's report also summarizes medical records from Nancy Berger. The report selectively references one note (out of four years of records documenting Greeley's debilitating condition) indicating that Greeley went on a road trip "where she was sitting and hiking." PL016.

73.    Dr. Brachman's report states that "surveillance reports from 1997 and 2000 indicate that Ms. Greeley was able to drive her own vehicle, perform errands, go boating with her husband, and spend a number of consecutive hours outside the house without the appearance of significant difficulties." PL016. The surveillance reports actually indicate that (i) Greeley's companion carried the bag out of the store while shopping, (ii) she sat still on a boat in gentle waters as her husband maneuvered the small sailboat, and (iii) the investigators were not able otherwise to observe Greeley while she was away from her residence. PL121-128; 020-026.

74.    Dr. Brachman's report concludes that Greeley's physical ability exceeds that necessary for a sedentary job, and that her symptoms "do not appear to cause an impairment that would prohibit her from physically performing the essential functions of a sedentary job." PL016.

75.    Dr. Brachman's report dismisses the notation relative to fibromyalgia, stating "the diagnosis of fibromyalgia was never made or documented in any of the treatment records." PL016.

**Prudential Terminates Greeley's Claim**

76.    On December 21, 2000, Prudential terminated Greeley's Long Term Disability Claim effective January 1, 2001. PL007-011. However, Prudential stated that it would extend her benefits "as a measure of assistance" through March 7, 2001. Id.

77.    The stated bases for the termination were that:

a.    Her position was "administrative and sedentary in nature".

b.    The IMEs conducted by Drs. Pick, Donelson, and Lipsitt support the conclusion that she is not Totally Disabled.

c.    The surveillance reports from November and December, 1997, and August, 2000, indicate "that [Greeley is] very active in her community and [has] a level of functioning that surpasses the physical requirements of sedentary work;" to wit:

i.    Greeley had watercolors for sale at the Featherstone Meeting House in 1997 for between $325-$395 each;

ii.    She had "the capacity" to be out of her home for full days;

iii.    She had been observed socializing with peers, shopping and boating;

iv.    She was a member of the Executive Committee of the Chilmark Affairs Council; and

    v.  She attended art classes, exercised for "long durations daily," and gardened, "all which require abilities exceeding those required for a sedentary job." PL008-011.

  d.  Prudential had determined, as of February, 1996, that her benefits were limited to two additional years under the benefit limitation for disabilities caused by psychiatric disorders. PL009.

**Greeley Requests Documentation To Appeal the Termination**

78.  On January 21, 2000, Greeley requested "all information regarding the appeal process as well as a copy of the Long Term Disability Policy that was in effect at the time I became disabled…" PL281

79.  On March 7, 2001, Greeley, through her counsel, also requested "copies of any documents and other materials upon which Prudential relied with regard to its letter of December 21, 2000…" PL258; 284-285.

80.  In response, on April 3, 2001, Prudential provided what it claimed to be "Greeley's LTD claim file and the documentation that was used to render a determination on her claim." PL280.

81.  After reviewing those documents, it became clear that the file provided to Greeley was incomplete. PL258-259; PL287-288. Attorney Richard D. Glovsky, counsel for Greeley, requested missing materials on April 25, 2001, specifically requesting seven items, including (i) the job description upon which Prudential relied, (ii) documents containing statements Prudential attributed to Greeley, (iii) documentation supporting Prudential's contention that Social Security benefits had been denied, (iv) surveillance videotapes, (v) an authorization to release

- 18 -

medical records purportedly signed by Greeley, (vi) questions propounded by Prudential to Dr. Michaud, and (vii) documents concerning the surveillance report.  Id.

82.    Prudential failed to send several of the requested documents, including documentation of Greeley's purported statements, a surveillance video, documents regarding the surveillance, Social Security benefits' documentation, and the medical records' authorization. Prudential admitted that it had sent only those documents which *Prudential* deemed relevant to its decision.  PL264-266; 289.

**First Appeal**

83.    On October 25, 2001, Greeley appealed the decision to terminate her benefits. PL253-313.  As part of her submission, she attached a bates-stamped copy of every document Prudential had provided to her.  See PL006-250; 280.

84.    In the appeal, Greeley chronicled Prudential's failure to provide the entire claim file which hindered her ability to effectively appeal. PL264-266.  She argued that the appeal should be decided in her favor on those grounds alone.  PL266.

85.    Substantively, Greeley argued that Prudential's decision was improper because her position as Manufacturing Manager was neither administrative nor sedentary. PL266-270; 294, 299-301.  She submitted detailed materials demonstrating the demanding nature of her position at Digital.  Id.

86.    Moreover, Greeley argued that the surveillance in no way established that she was fit to return to work. PL271-272.  Among other things, Greeley also

demonstrated that her position on the Chilmark Town Affairs Counsel consisted of attending a total of four meetings over the course of four years. PL273; 302.

87.    Greeley also challenged the doctors' opinions referenced by Prudential in denying her claim. Specifically, she argued in detail that none of the opinions was sufficient to substantiate Prudential's position that Greeley's condition was either psychosomatic or nonexistent. PL272-273.

88.    Finally, Greeley argued in detail that Dr. Brachman's review of the medical records was equally inadequate to support Prudential's position. She argued that Dr. Brachman failed to examine early medical records and that her opinion "overlooked" numerous references to specific examinations, functional assessments, and opinions of Greeley's treating practitioners. PL274.

89.    Greeley also submitted additional materials for Prudential's consideration. PL277-278; 307-313. Specifically, Matilde Flores submitted an additional report noting, *inter alia*, "that [Greeley] has a tendency to muscular spasms affecting her temporomandibular joints, neck, shoulders and upper back," and that a ligament problem "creates a problem in her capacity to sustain activity for a long period of time, predisposing her to fatigue and or injury." PL307.

90.    In addition, Greeley submitted a report by Dr. Bernard S. Yudowitz, M.D., J.D. Pl308-310. Dr. Yudowitz's curriculum vitae was also provided. PL311-313. Among other things, Dr. Yudowitz established the first inpatient treatment center for chronic pain in Massachusetts, and served as the Medical Director Pain Management Unit and all pain services at that hospital from 1972 to 1996. PL308.

91.  Dr. Yudowitz reviewed the medical records and performed a psychiatric and chronic pain evaluation of Greeley on April 3, 2001.

92.  Based on all of the medical records and his own independent examination, Dr. Yudowitz diagnosed Greeley (consistent with Ms. LaGuardia's reports) with fibromyalgia. He explained that Greeley's unsuccessful TMJ surgery followed by years of pain progressively radiating diffusely throughout her musculature (as specifically documented in the record) "is the usual course of fibromylagia." PL309-310.

93.  He concluded that her condition meets Prudential's definition of total disability "in that as a result of a physical illness termed fibromyalgia, she is not able to perform the material and substantial duties of her occupation . . . [or] the substantial duties of any job for which she is reasonably fitted by her education, training or expertise." PL309-310.

94.  Dr. Yudowitz opined that a psychiatric diagnosis of her condition was entirely inappropriate, as fibromyalgia typically produces secondary psychological effects.

**Prudential's Denial of The First Appeal**

95.  Prudential, by letter dated January 14, 2002, denied Greeley's first appeal. PL314-317.

96.  Prudential's denial did not respond to Greeley's demonstration that Prudential failed to provide all relevant materials to her despite her requests. PL314-317.

97.  Prudential's denial also restated the medical summaries, surveillance observations, and alleged physical capabilities of Greeley cited in support of the first denial. Prudential stated that the additional reports from Dr. Yudowitz and

Matilde Flores had been "reviewed with our clinical team and medical director."[1] PL 316. Prudential has never provided Greeley with documentation from that purported review.

98.     Acknowledging that it had been wrong all along, Prudential now conceded that Greeley's position at Digital as Manufacturing Manager was not sedentary. PL316.

99.     Nonetheless, Prudential concluded that "the records do not support total disability from a sedentary occupation." PL316.

100.    Prudential cavalierly dismissed Dr. Yudowitz's diagnosis that Greeley does not have a psychological condition but rather suffers from fibromyalgia, stating "this is out of Dr. Yudowitz' scope to make a diagnosis of Fibromyalgia as he is a Psychiatrist." PL316. Prudential made this statement, despite its knowledge of Dr. Yudowitz' fourteen years of service as Medical Director of the Pain Management Unit and all pain services at the New England Rehabilitation Hospital and his impressive curriculum vitae. PL308-313.

101.    As set forth in the policy, a claimant is "totally disabled" if the she is not "able to perform for wage or profit the material and substantial duties of any job for which [she is] reasonably fitted by [her] education, training or experience..." (Emphasis added). PL314. Concluding Greeley is capable of "sedentary" work, Prudential stated that it performed a "vocational review" and identified four sedentary

---

[1] As only recently revealed in disclosures to the Court, see infra ¶¶ 148-151, Prudential's Medical Director, Marcia Scott, had been intimately involved since 1995 in orchestrating a campaign to obtain biased medical reports from Prudential's physicians in order to build a convincing case on paper to terminate Greeley's LTD benefits

positions in the Boston area that, according to Prudential, "Ms. Greeley possesses the education, training and experience to perform." PL 316-317.

102. In addition, Prudential stated that the medical documentation in the file "suggests that Ms. Greeley may have a psychological condition which is impacting her ability to return to work." PL317. The actual standard, as set forth in the policy, is whether the "disability, as determined by Prudential, is caused at least in part by a mental, psychoneurotic or personality disorder..." PL 314 (emphasis added).

103. Prudential did not provide Greeley with any additional documentation supporting its denial. For example, it did not provide the "vocational assessment" records to which it referred. Nor did Prudential provide documents concerning the purported "review[] with our clinical team and medical director."

**The Second Appeal**

104. Greeley submitted her second appeal on March 29, 2002. PL318-363.

105. In that appeal, Greeley argued that "[t]he question is not whether Ms. Greeley can perform a sedentary position; the question (according to the language of the policy at issue in this matter) is whether Ms. Greeley can perform 'the material and substantial duties of [her] own occupation' ... or 'any job in which [she is] reasonably fitted by [her] education, training or experience.' - - not some sort of sedentary job unsuited to her." PL325.

106. Greeley argued that it was "highly objectionable" for Prudential to be augmenting the record with vocational assessments at that late stage of the proceedings. She argued, moreover, that it was impossible for her to adequately respond to Prudential's new position (that she could perform several sedentary jobs), because

Prudential had once again made that determination based upon records and documentation to which Greeley was not given access. PL325-326.

107.   In any event, Greeley argued, the identified positions were wholly unsuited (let alone "reasonably fitted") for a woman of her education, training and experience. PL326.

108.   In addition, Greeley reiterated her position that her "activities are very limited. For example, Prudential's private investigator's videotape shows nothing but one or two people on a sailfish. We urge you to watch this videotape. Ms. Greeley's participation in Chilmark town affairs was attendance at occasional meetings. To suggest that because Ms. Greeley attended those meetings, sat on a sailfish boat, painted, socialized and shopped qualifies her for full-time, 9-5, 5 days per week employment (sedentary or not) is, with all due respect, a stretch that tears irreparably the fabric of [Prudential's] position." PL325.

109.   Greeley also argued that Prudential misapplied the psychiatric benefit limitation. Specifically, Greeley argued that "whether Ms. Greeley 'may' have a psychological condition which 'impacts' her ability to work is not the question. The question, according to the policy, is whether Ms. Greeley's disability was caused by 'a mental, psychoneurotic or personality disorder.'" PL326.

110.   Finally, Greeley argued that Prudential's decision to credit largely inconclusive and ambiguous medical opinions over the detailed and definitive report of Dr. Yudowitz was unjustified. Specifically, she argued that Prudential "apparently embraces [its] reading of the psychiatric opinions from 1995 and 1996 (largely ambiguous and non-conclusory) …, yet [it] rejects the view of a world-renowned

psychiatric expert who has reviewed Ms. Greeley's condition in depth as recently as last year." PL327.

111.    Ms. Greeley supplemented the appeal on July 18, 2002 and February 21, 2003, with reports from Matilde Flores, Lic. AC. CCH and Dr. Emmanuel Green. PL364-365; 366-391.

112.    Ms. Flores stated that as a result of treating Greeley for fourteen years, she "can definitively state" that Greeley's pain is based on her physical symptoms deriving from her diagnosed medical condition.  She stated that years of chronic pain have had a "number of deleterious effects on her" and "there is no doubt that she is incapable of performing the duties of any job." PL365.

113.    Dr. Emmanuel Green's vocational evaluation concluded that "Greeley, at the present time, is **Totally Occupationally Disabled** from performing any gainful work activity as a direct result of her experience of significant pain resulting from her current physical condition." PL379 (emphasis in original).  The report further concluded that her "functional impairments result in significant occupational limitations that preclude her from … performing, on a sustained basis, the material and substantial duties of any job for which she is reasonably fitted by her education, occupational background, training or experience." PL378.

**Prudential Denies The Second Appeal**

114.    By letter dated March 24, 2003, Prudential denied Greeley's second appeal. PL393-396.

115.    Again changing its rationale, Prudential now took the position that Greeley was ineligible for benefits based on part 1(b) of the definition of Total Disability—that

is, the claimant is "not able to perform, for wage or profit, the material and substantial duties of any job for which [she is] reasonably fitted by [her] education, training, or experience." PL394. In addition, Prudential stated that the psychiatric limitation applied. PL394.

116.    Prudential regurgitated all the reasons it had previously cited in support of its initial denial. PL394-395.

117.    Now faced with Dr. Green's extensive and definitive report stating that Greeley is incapable of performing any job for which she is reasonably fitted by her education, occupational background, training or experience, however, Prudential resorted to hiding behind the psychiatric benefit limitation. PL394. Prudential merely dismissed Dr. Green's report, stating that "[s]ince Ms. Greeley has already been paid the maximum benefit period payable for her psychological condition, the report completed by Dr. Green does not document an impairment that would support an inability on Ms. Greeley's part to perform sedentary work." PL395.

118.    Prudential concluded that "we have found *no evidence* of a sickness or accidental injury that would prevent Ms. Greeley from engaging in any occupation." PL396 (emphasis added).

**Greeley Files Her Final Appeal**

119.    Greeley appealed for a third and final time on July 10, 2003—this time to the full Appeals Committee. PL399-417.

120.    Greeley documented Prudential's prior failures to produce documents to Greeley, which were obviously relevant to Prudential's decision to terminate her benefits. PL401-402.

121.    Before deciding the merits of the Appeal, on September 2, 2003, Prudential responded by providing additional documents. PL418-431. This disclosure occurred two and one half (2 ½) years and three appeals after the withheld materials were first requested by Greeley. See PL287-288.

122.    Even this response, however, was incomplete. PL432. Prudential failed to provide the requested "Employer Statement," documentation of the purported telephone conference with Greeley, records and invoices pertaining to the surveillance and medical consultations, and the Policy. PL401-402; PL432. While Prudential provided the same videotape from August, 2000, that it had previously given to Greeley, it did not provide the additional videotape from 1997. PL432.

123.    The record is clear that Prudential has a second videotape in its possession that it, to this day, continues to withhold from Greeley. For example, the investigator's report from November 5, 1997 states that he took video surveillance of Greeley. PL145. Yet, Prudential has only produced the video from August, 2000. In addition, Prudential's correspondence in 2001 to Greeley and her counsel make reference to multiple surveillance videos. PL289 ("we are arranging to have copies of *the surveillance videos* sent to your attention"). Finally, in documents that Prudential is only *now* producing to the Court (but which have never previously been produced to Greeley), Prudential reveals that it was invoiced for a videotape from the investigator in 1997. See DG169. Still, to this day, Greeley has received only one videotape.

124.   Greeley, through her attorney, responded to the deficient response on September 12, 2003.  PL432.

125.   On October 20, 2003, Prudential responded by providing just the Employer Statement, but not the additional videotape or other previously requested materials.  PL433-434.

126.   Greeley's third appeal carefully documented the history of the claim and the prior appeal denials, including Prudential's lack of candor and failure to provide materials necessary to be able to fairly and adequately appeal Prudential's decision terminating her benefits.  PL401-402.

127.   The appeal documented Prudential's shifting reasons for denying her claim and prior appeals.  It carefully detailed why Prudential's earlier decisions had no basis in the record and were contradicted by the overwhelming weight of the evidence.  PL402-406.

**Prudential Denies Greeley's Final Appeal**

128.   By letter dated January 9, 2003, Prudential denied Greeley's final appeal.  PL437-439.  The letter was improperly dated and should have read: January 9, 2004.

129.   In the denial, Prudential stated that it "forwarded [Greeley's] medical file" to an unidentified "consulting physician."  Prudential never provided any documentation to Greeley concerning this purported review by the "consulting physician."

130.   Prudential, once again, relied upon the 1995 opinions of Drs. Smith and Lipsitt, stating that "two psychiatrists have concluded that Greeley has a somatoform disorder."  In reality, Dr. Smith could only say that she might have a psychiatric

disorder, see PL169-170, and Dr. Lipsitt was unable to provide a positive diagnosis. PL163-164. See also, *infra* ¶148 (Dr. Lipsitt told Prudential orally that Greeley "definitely" had a "chronic pain syndrome") .

131. Further, Prudential repeated its untenable position that Greeley could return to work because "she appears to lead an active life including painting and sailing." PL438.

132. Despite having acknowledged Dr. Green's vocational assessment which states that "Greeley . . . is **Totally Occupationally Disabled** from performing any gainful work activity as a direct result of her experience of significant pain resulting from her current physical condition," Prudential made the patently false claim that "there appears to be no documentation in these records that supports a physical inability to perform the material and substantial duties of a sedentary or light work job." PL438.

133. Finally, Prudential stated that a "Transferable Skills Analysis/Labor Market Survey" was conducted based upon the unidentified "consulting physician's" file review and Dr. Green's Vocational Assessment (which concluded that "Greeley... is **Totally Occupationally Disabled**). As a result of that purported analysis, Prudential claimed that Greeley "is expected to be reasonably employable in" several positions for which Prudential provided no description apart from job title and salary range. PL439.

134. Greeley was never provided with any documentation or information concerning the "Transferable Skills Analysis/Labor Market Survey" to which Prudential referred, apart from what appears in Prudential's denial letter.

135.    Finally, despite the overwhelming amount of evidence demonstrating Greeley's

Total Disability, Prudential restated its indefensible position that "we have found

*no evidence* of a sickness or accidental injury that would prevent Ms. Greeley

from engaging in *any gainful occupation*." PL439 (emphasis added).  The actual

standard, as set forth in the policy, is whether Greeley is capable of performing

"any job for which [she is] reasonably fitted by [her] education, training, or

experience."

**Prudential Reveals a Host of Incriminating Documents to the Court[2]**

136.    Upon Prudential's filing its proposed administrative record with this Honorable

Court, Greeley learned for the first time that Prudential had relied upon a host of

undisclosed documents in terminating her benefits and denying her appeals.  <u>See</u>

Exh. A.

137.    Prudential produced the LTD Policy.  DG001-DG052.  This was the first time

Greeley had ever seen the policy, though she had requested it in January of 2000.

PL281.

138.    The policy defines "sickness" as "any disorder of the body or mind."  DG014.

Greeley was hitherto unaware of this fact.

139.    In addition, Prudential produced various journal articles it had never produced to

Greeley.  <u>See</u> DG507-588.

140.    Similarly, Prudential had never provided Greeley with internal "SOAP" notes and

memoranda detailing communications with various persons including Greeley.

---

[2] Exhibit A, attached hereto, is a chart listing every document contained in Prudential's Proposed
Administrative Record.  The fourth column displays which of those documents were withheld from Greeley
during her administrative appeals.  The fifth column indicates those documents that were produced to
Greeley during her administrative appeal.

See DG457-483; 484-504. "SOAP" is apparently an acronym for "Subjective, Objective, Analysis, Plan" and is used as a format for documenting internal claims handling. See id.

141. During her administrative appeals, Greeley specifically requested documentation of telephone conversations with her. PL287. Prudential never produced it to her despite the fact that it did, in fact, have it. DG487-488.

142. The SOAP notes are quite revealing. For example, a note from October 2, 1997, indicates that of all the evaluations for which Prudential contracted, including Dr. Lipsitt, "none are conclusive re: totally disabling impairment." DG465. Yet, in terminating Greeley's benefits and denying her subsequent appeals, Prudential characterized those reports as conclusive proof that Greeley's was not disabled. PL007-011; PL314-317; PL393-396; PL437-439.

143. Similarly, the SOAP notes reveal that Prudential was using incorrect standards to evaluate Greeley's claim. For example, a SOAP note from December 11, 2001, reveals that Prudential, in evaluating whether Greeley was totally disabled, examined merely whether Greeley "possesses the physical functional capabilities to perform a sedentary occupation." DG0473. However, the policy quite clearly states that the standard is whether "[d]ue to sickness . . . [she was] not able to perform, for wage or profit, the material and substantial duties of any job for which [she was] reasonably fitted by your education, training, or experience." PL007-PL008. Whether Greeley had the "physical functional capabilities" to perform a sedentary occupation is a very different question than whether she was "able to perform" a job reasonably suited to her executive level qualifications.

144.  The SOAP notes also demonstrate that during Greeley's administrative appeals, Prudential mischaracterized determinations it previously made concerning her eligibility for benefits. For example, in terminating Greeley's benefits, Prudential claimed that in February, 1996, it had determined that her eligibility for benefits was limited to two additional years under the psychiatric benefit limitation. PL009. Yet, the SOAP notes reveal that Prudential did not make such a determination: in March, 1996, SOAP notes state that that Prudential "needed to review the possibility of applying the [limitation] on claim [sic] going forward." DG462.

145.  The SOAP notes also demonstrate that Prudential was mischaracterizing the surveillance. For example, a note from 2000 relates that surveillance revealed that Greeley "attends art shows and exhibits." DG467. In reality, the surveillance revealed that the employees working at the gallery displaying her art had never seen or even heard of Greeley.

146.  Even more revealing and incriminating, however, are documents memorializing telephone conversations. E.g., DG490-DG491. For example, Dr. Lipsitt's report indicated that he "had been told in advance that Greeley had a long history of chronic somatic complaints." PL162. A memorandum of a telephone conversation between Dr. Lipsitt and Prudential reveals that Prudential "familiarized" Dr. Lipsitt with Greeley's case. DG490. In addition, that memorandum indicates that Prudential provided a summary of Greeley's case to Dr. Lipsitt. Id. A letter from Dr. Lipsitt, which also was never produced to

Greeley, indicates that he "had two telephone discussions with Dr. Marcia Scott regarding the patient." DG147.

147. Prudential never produced to Greeley, and has not produced to the Court in this case, the substance of those telephone conversations or the "summary" which Prudential provided to Dr. Lipsitt. However, from Dr. Lipsitt's report it is apparent that Prudential, at minimum, told Dr. Lipsitt that Greeley's condition was somatic. PL162. Greeley and the Court are left to speculate as to what else was communicated to Dr. Lipsitt either orally or in Prudential's summary of Greeley's case.

148. Equally incriminating is another documented telephone message left by Dr. Lipsitt after he examined Greeley. DG491. Dr. Lipsitt's telephone message related that Greeley "**definitely has a chronic pain syndrome – it is difficult to assess how much of that is psychological/physical**." DG491 (emphasis added). This is completely inconsistent with Prudential's contention that Dr. Lipsitt opined that Greeley had a somatoform disorder. Prudential misrepresented Dr. Lipsitt's position to Greeley. PL

149. Similarly, internal emails from Prudential reveal that in 1995 Prudential was planning its course of action, with the assistance of physicians it hired, to amass medical opinions adverse to Greeley in order to terminate her disability claim. See DG091.

150. For example, an internal email indicates that Prudential's Medical Director, Marcia Scott, was discussing Greeley's claim with "Bob Pick" (Dr. Pick) and Dr. Donelson before their evaluation, and "asked them not to get into psych as well

- 33 -

[sic] do that later.. if she refuses a psych exam *we can either get them to recommend it later or forget it if there is enough in their exams."* DG091 (emphasis added). Clearly, Prudential was manipulating Dr. Pick's and Dr. Donelson's evaluations and was able to "get them" to make recommendations and include material in their examinations that Prudential engineered. Id.

151. Despite having already discussed Greeley's case with Dr. Pick, Prudential then attempted to cover its tracks by preparing a carefully worded letter to Drs. Pick and Donelson to create the appearance of objectivity and impartiality. See DG091. Prudential's "Medical Director" carefully told lower level Prudential employees how to word the letters. DG091-DG092. Prudential never produced these letters to Greeley. Moreover, the text of those letters (as provided to the Court by Prudential) is conspicuously obscured by photocopied mailing labels. DG100-101.

152. A letter from Prudential to Dr. Brachman dated December 05, 2000, which was never produced to Greeley, indicates that Dr. Brachman had previously agreed to perform a review of Greeley's file. DG218. However, there is no other documentation in the record of prior contact with Dr. Brachman, and thus Greeley and this Court are left to speculate as to the substance of prior communications between Prudential and Dr. Brachman.

153. In any event, the December 2000 letter from Prudential to Dr. Brachman states that "the surveillance reports completed in 1997 and 2000 document that that Mrs. Greeley is quite active in her community." DG218. This is totally inconsistent with what the surveillance actually showed.

154.  The letter to Dr. Brachman also reveals that Prudential was aware Greeley had fibromyalgia. DG218. As the letter states, "Ms. Greeley has treated for the last several years with homeopathic treatments and exercise therapy to treat Fibromyalgia." DG218. Yet, in denying Greeley's first appeal, Prudential claimed that there was no evidence Greeley had fibromyalgia.

155.  Prudential never provided Greeley with the medical report by Dr. Moorehead, now contained in its proposed administrative record. DG340-346.

156.  Prudential failed to provide Greeley with various invoices to doctors and investigators. Those invoices reveal the existence of a videotape from the investigator in 1997 which has never been produced to Greeley. E.g., DG169.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## STATEMENT OF UNDISPUTED FACTS[3]

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      The Plaintiff objects to affidavit of Laura Hannan.  The administrative record speaks for itself.

5.      Admitted.

6.      The Plaintiff objects to the affidavit of Laura Hannan.  The administrative record speaks for itself.

7.      The Plaintiff objects to the affidavit of Laura Hannan.  The administrative record speaks for itself.

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     Admitted.

13.     Denied.  The Plaintiff objects to the affidavit of Laura Hannan.  The administrative record speaks for itself.

14.     Admitted.

15.     Admitted.

---

[3] The following numbered responses specifically correspond to the "Defendant's, the Prudential Insurance Company of America And [sic] Local Rule 56.1 Statement of Undisputed Facts."  Please see Plaintiff's Concise Statement ¶¶ 1 – 156 above for Plaintiff's complete statement of additional undisputed facts.

16.     Denied to the extent the physicians are characterized as "independent."  The administrative record speaks for itself.

17.     Denied to the extent the physicians are characterized as "independent."  The administrative record speaks for itself.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Denied to the extent Dr. Donelson is characterized as "independent."

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Admitted.

29.     Admitted.

30.     Admitted.

31.     Admitted.

32.     Admitted.

33.     Admitted.

34.     Admitted.

35.     Admitted.

36.    Denied.  The Plaintiff objects to affidavit of Laura Hannan.  The administrative record speaks for itself.

37.    Denied.  The Plaintiff objects to the affidavit of Laura Hannan and her characterization of Prudential's review as "careful."  The administrative record speaks for itself.

38.    Admitted.

39.    Admitted.

40.    Admitted.

41.    Admitted.

42.    Admitted.

43.    Admitted.

44.    Admitted.

45.    Denied.  The administrative record speaks for itself.

46.    Admitted.

47.    Admitted.

48.    Admitted.

49.    Admitted.

50.    Admitted.

51.    Admitted.

52.    Denied.  The Plaintiff objects to the affidavit of Laura Hannan.  The administrative record speaks for itself.

53.     Denied.  Prudential never mentioned the name "Dr. Moorehead" in its final denial.  DG345.  Prudential never provided documentation of the "consulting physician's" purported review.

54.     Admitted.

55.     Denied.  Prudential did not provide to Greeley the report of the "consulting physician."

56.     Denied.  Prudential did not provide to Greeley reports from the purported TSA or labor market survey.

57.     Denied.  Prudential did not provide to Greeley reports from the purported TSA or labor market survey.

58.     Admitted.

59.     Denied.  Prudential did not provide to Greeley reports from the purported TSA or labor market survey.

60.     Admitted.

61.     Admitted.

62.     Admitted.

Respectfully Submitted,

DAWN M. GREELEY

By her Attorneys,

PRINCE, LOBEL, GLOVSKY & TYE LLP

By:___/s/ Richard D. Glovsky_____
Richard D. Glovsky (BBO#: 195820)
Joshua A. Lewin (BBO#: 658299)
585 Commercial Street
Boston, MA  02109
(617) 456-8000